## Marshall Milling Company, Appellee, v. Louis Rosenbluth, trading as Anchor Mills, Appellant.

### Gen. No. 28,535.

1.  FOREIGN CORPORATIONS—*when right to sue for damages for breach of sales contract shown as matter of law*.   A foreign milling corporation is shown, as a matter of law, to have had the right to sue defendant for damages for breach of contract to purchase flour, by evidence that such corporation maintained a resident salesman in the State and kept a supply of flour stored in a public warehouse from which to make deliveries on sales made by the salesman and from which part of the flour sold to defendant was delivered to him, that all orders taken by the salesman were forwarded to plaintiff for approval or rejection, that no office was maintained by the salesman although his business cards and letterheads described him as

"General Manager, Chicago, Ill." and contained his residence address, and that plaintiff's business within the State was confined to interstate commerce.

2. SALES—*delivery orders from seller to buyer as assignment pro tanto of warehouse receipt.* A seller of flour is shown, as a matter of law, not to have breached the contract by the act of the warehouseman in delivering the wrong flour to the buyer, where the evidence shows that the seller had a large quantity of flour in the warehouse from which to fill its orders for which a non-negotiable receipt had been issued to it by the warehouseman, that, upon the sale to defendant, delivery orders were issud to him by the seller directing the warehouseman to deliver specified quantities of flour to defendant from that covered by the warehouse receipt, under which defendant had received a portion of the flour sold, such orders being, in effect, assignments, *pro tanto,* of the warehouse receipt which made the warehouseman the agent of the buyer to the extent thereof, even though title was retained in the seller under the contract until payment, since such transaction is within the Uniform Sales Act, sec. 22, par. (a) Cahill's Ill. St. ch. 121a, ¶ 25, providing that in such case the goods are at the buyer's risk from the time of delivery.

3. DAMAGES—*when provision for liquidated damages for breach of flour sales contract unenforceable as penalty.* A provision in a contract for the sale of flour permitting the seller, in case of breach by the buyer, to recover not only the difference between the contract price and the market price, but also an additional sum, the amount of which is arbitrarily determinable by the seller by the extension of the contract for successive thirty-day periods indefinitely after actual breach by the buyer, is unconscionable and unenforceable as a penalty, especially in the absence of evidence that damages, according to the usual rule, are difficult of ascertainment, in view of the stapleness of the article sold.

4. DAMAGES—*flour constructively delivered to buyer not "unshipped" under liquidated damage clause in contract.* In an action by the seller of flour against the buyer for damages for breach of the contract, which provided different measures of damages for breach as to flour shipped and that remaining unshipped, flour stored in a public warehouse by the seller and covered by written orders given by the seller to the buyer directing the warehouseman to deliver the quantities specified to the buyer cannot be considered as "unshipped" for the purpose of increasing damages, and as to such flour the damages must be ascertained under the ordinary rule provided in the contract, as of the difference between the contract and the market prices.

5. SALES—*buyer entitled to credit for goods returned after payment against damages for breach.* In an action by the seller of flour

against the buyer for breach of the contract by refusal to accept the goods after part performance, it was error not to allow the buyer credit for the amount paid by him for flour which was not covered by the contract and was delivered to him by the warehouseman by mistake and which he returned to the warehouse upon discovering the mistake.

Appeal by defendant from the Municipal Court of Chicago; the Hon. LAURENCE B. JACOBS, Judge, presiding. Heard in the second division of this court for the first district at the March term, 1923. Reversed and remanded. Opinion filed January 22, 1924. Rehearing denied February 4, 1924.

LE BOSKY & PENNINGTON, for appellant.

WINSTON, STRAWN & SHAW, for appellee; HAROLD BEACOM and EDWARD G. INCE, of counsel.

MR. JUSTICE FITCH delivered the opinion of the court.

By this appeal defendant seeks to reverse a judgment against him for $6,593.65, entered in the municipal court upon an instructed verdict for the plaintiff in a suit brought to recover damages for an alleged breach of a written contract for the purchase by defendant from the plaintiff of 1,845 barrels of flour. The plaintiff's statement of claim set out the written contract in full, alleged that 630 barrels had been received and paid for by the defendant, but that defendant had failed to give shipping directions for the remaining 1,215 barrels, as required by the contract, and claimed the amount above stated as liquidated damages under the terms of the contract. The defenses were that the plaintiff is a foreign corporation doing business in Illinois without a license, and that the plaintiff first breached the contract by delivering a certain quantity of flour of a quality inferior to that specified in the contract. In this court defendant contends that it was error to direct a verdict for the plaintiff because, it is said, there was evidence tending to

prove both of the defenses above stated; and contends, further, that in any event the measure of damages adopted by the court in directing a verdict was wrong.

The material facts are not disputed. Plaintiff is a corporation organized under the laws of Minnesota. Its office is at Marshall, Minnesota, where it operates a mill for the manufacture of flour. It has never obtained a license to do business in this State. At the time of the transaction in question, it had a representative residing in Chicago, named Balch, who solicited orders for the plaintiff's flour from customers in Chicago and vicinity, and forwarded all such orders to the plaintiff for its approval or rejection. Balch carried business cards reading: "Marshall Milling Co., Marshall, Minn., C. A. Balch, General Manager, Chicago, Ill.," and used letterheads, furnished by the plaintiff, containing the same words. Two of such letterheads, offered in evidence, contained also a street number, which, the evidence shows, was the residence of Balch in Chicago. He testified that he maintained no office at his residence, and that he was away from his residence most of the day soliciting orders.

The contract in question is dated September 23, 1920. At least six months prior to that date, the plaintiff had shipped from its mill in Minnesota to Chicago, and placed in a public warehouse in that city, the equivalent of 2,000 barrels of flour, contained in jute sacks, weighing 140 pounds each. The plaintiff's president testified that such flour was shipped to Chicago "for temporary storage awaiting disposition of it later wherever we might desire to use it." From this store of flour plaintiff had sold and delivered prior to September 23, 1920, the equivalent of 155 barrels, leaving 1,845 barrels in the warehouse. In the early part of September, defendant was solicited by Balch to purchase the remainder of this stock of flour, and was furnished seven sacks (five barrels) as a test or sample of the lot. On September 23, 1920, defend-

ant agreed with Balch to buy the 1,845 barrels at the price of $11.75 a barrel. This agreement was written by Balch upon a printed contract form, evidently prepared by plaintiff and furnished by it to its salesmen for their use in making contracts, "to sell, by description, goods to be manufactured," as stated in the printed form. In the blank spaces of this form were written the number of barrels, the size and kind of packages ("140 jutes"), the brand ("Marshall's Best") and the price per barrel, all to be shipped to Anchor Mills, Chicago, on or before November 23, 1920, "on shipping directions to be furnished by buyer; buyer to have option of warehouse delivery or mill shipments." This was signed by defendant and by Balch as "salesman" for plaintiff. Balch at once forwarded this order to the plaintiff at Marshall, Minnesota, from which place plaintiff telegraphed its approval of the same. On September 30, 1920, Balch delivered to the defendant a written order on the warehouse for the delivery to defendant of 700 jutes, or 500 barrels, of "Marshall's Best Flour," and under this order the defendant began hauling flour from the warehouse. After 50 barrels had been hauled away, the remainder of the flour was inspected and found to be slightly wormy. Defendant complained of this to Balch, saying plaintiff would have to "recondition" the flour (which means to sift and resack it), or make an allowance therefor. The plaintiff's president came to Chicago and that matter was discussed. An understanding was reached that defendant should be allowed seventy-five cents a barrel. Thereupon a new blank contract form was filled out, identical in every respect with the first, except that it contained the words: "Buyer to have allowance of 75¢ per barrel on wormy flour." This was confirmed by the plaintiff in a letter written and mailed at Marshall, Minnesota. This contract is dated September 23, 1920, though in fact made and confirmed a month later.

On October 22, 1920, Balch gave to the defendant a second order on the warehouse for the delivery of an additional 500 barrels. Under these orders, the equivalent of 630 barrels of flour was withdrawn from the warehouse by the defendant, and sold to his trade. About the middle of November, 1920, defendant told Balch his customers were complaining of the quality of some of the flour, and on inquiry Balch learned that 217 jutes, or 155 barrels, of the flour taken from the warehouse by defendant was not the flour sold to defendant, but was flour of inferior quality which had been stored in the warehouse by another milling company. When the mistake was thus discovered, Balch and the defendant wrote to plaintiff about it and plaintiff replied that it was not responsible for the mistake of the warehouse. This reply so angered the defendant that he immediately told Balch that he was "through with the Marshall Milling Company," and would "not take another bag of flour from the warehouse." This occurred on November 20, 1920, and defendant did not thereafter take from the warehouse any more of the flour. Defendant then had in his possession plaintiff's written orders directing the warehouse to deliver to defendant at least 370 barrels of flour, in addition to the 630 barrels he had taken away. Defendant paid the plaintiff for the 630 barrels he received. Subsequently, he returned 80 barrels to the warehouse, because they were not his flour and had been taken out by mistake. Plaintiff has never repaid or credited to defendant the amount ($880) paid by defendant for the 80 barrels so returned.

The plaintiff's president testified that the remainder of the flour, left in the warehouse "after the transaction with Rosenbluth," was shipped east. Defendant's counsel inquired whether it was sold and, if so, to whom, and at what price, but objections to these questions were sustained and no answers were given. There is nothing else in the record to show when, how

or in what manner such remainder was disposed of, if at all. In March, 1921, the plaintiff sent the defendant a formal notice stating, in effect, that unless plaintiff received from defendant "shipping directions" for the remainder of the flour covered by the contract, plaintiff would, on March 23, 1920, terminate the contract and sue for the liquidated damages specified therein. Defendant paid no attention to this notice and plaintiff then brought this suit.

Upon the evidence contained in this record we are of the opinion that the trial court did not err in directing a verdict for the plaintiff, so far as the questions of the plaintiff's right to sue in this State and of the defendant's liability are concerned, but we are of the opinion that the court erred as to the measure and the amount of damages.

Upon the question whether the plaintiff was doing business in this State in violation of the statute, there was no conflict in the evidence, and the application of the statute to the uncontradicted facts is a question of law for the court. Upon the authority of *Lehigh Portland Cement Co. v. McLean*, 245 Ill. 326; *American Art Works v. Chicago Picture Frame Works*, 264 Ill. 610, and *Frank Prox Co. v. Bryan*, 185 Ill. App. 322, we are of the opinion that the trial court correctly decided that the only business plaintiff was doing in this State was interstate commerce, for which the plaintiff was not required to obtain a license.

Upon the question whether the delivery by the warehouse to the defendant of the wrong flour in November, 1920, was a breach of the contract by the plaintiff, there is likewise no conflict in the evidence. Whether the warehouse company was acting as the agent of the plaintiff at the time the mistake occurred, as contended by defendant's counsel, is a question of law, to be determined by the correct application of legal principles to the undisputed facts of the case. The relation that exists between an owner of goods and a

warehouseman with whom such goods have been stored is that of bailor and bailee. (27 R. C. L. 953 et seq.; 40 Cyc. 404.) Where property in the hands of a bailee is sold by the owner, and the bailee is notified of such sale, such notice will work a change of possession, and thereupon the possession of the bailee becomes that of the purchaser, and the bailee becomes the keeper for the true owner, by operation of law. (*Hodges v. Hurd*, 47 Ill. 363; *Riddle v. Blair*, 148 Ala. 461; 3 R. C. L. 91; 33 L. R. A. [N. S.] 694.) At the time the flour in this case was first received by the warehouse company, it issued to the plaintiff its nonnegotiable receipt for the same. When the flour was sold to the defendant, an arrangement was made with the warehouse company under which the defendant was permitted to take from the warehouse, upon the written orders of the plaintiff, such quantities as the defendant desired to use. At the time the mistake occurred, the defendant had in its possession three or four of such written orders of the plaintiff, directing the warehouse company to deliver to defendant at least 1,005 barrels of flour (plaintiff's counsel say 1,105 barrels), upon which orders the defendant had been taking from the warehouse every few days a wagonload or two of flour, until 630 barrels had been thus removed from the warehouse by defendant, including the 155 barrels that did not belong to him. When these orders were delivered to the defendant and accepted and acted upon by the warehouse company, the right to the possession of the quantity of flour specified in such orders passed from the plaintiff to the defendant (*Hodges v. Hurd, supra*), and the warehouse company thereby became the bailee for the defendant as to all flour covered by such orders. (27 R. C. L. 972.) In effect, these orders were assignments, *pro tanto,* of the warehouse receipt. Defendant's counsel argue that this could not have been the intention of the parties, for the reason that the con-

tract specifically provides that the "seller retains title to goods, to secure buyer's performance, until full payment is made therefor." Such a provision, however, does not change the legal effect of the orders given to the warehouse company for the delivery of the flour to defendant. Paragraph (a) of section 22 of the Uniform Sales Act [Cahill's Ill. St. ch. 121a, ¶ 25] provides: "Where delivery of goods has been made to the buyer, or to a bailee for the buyer, in pursuance of the contract, and the property in the goods has been retained by the seller merely to secure performance by the buyer of his obligations under the contract, the goods are at the buyer's risk from the time of such delivery." This was the situation at the time the mistake occurred. The flour which the warehouse company was then attempting to deliver was included in the last order of the plaintiff for 500 barrels, and the right of possession of such 500 barrels had passed from plaintiff to the defendant on October 22, 1920, by virtue of the order of that date and the acceptance of notice thereof as shown by the delivery of flour upon the same. The mistake of the warehouse company in delivering the wrong flour was therefore a mistake for which the plaintiff was not legally chargeable. The warehouse company was not then the plaintiff's agent, but was a bailee for the defendant. Whatever right of action accrued to the defendant on account of such mistake was not against the plaintiff. It follows that when plaintiff declined to accept any responsibility for this mistake of the warehouse company, plaintiff was right; or, to put the conclusion in a different form, it follows that defendant was wrong in claiming that the mistake of the warehouse company constituted a breach by plaintiff of the contract.

Upon the question of damages a more difficult question is presented. The measure of damages for a breach of a contract for the purchase of goods where the purchaser fails or refuses to accept them at the

stipulated time is, ordinarily, the difference between the market price and the contract price of such goods at the time and place fixed for the delivery thereof. (*Kadish v. Young,* 108 Ill. 170.) Here there is no evidence as to the market price of flour of any kind or quality at any time or place, nor was it shown that there was no market price. The damages allowed are the result of a computation made by one of plaintiff's witnesses, based upon the plaintiff's interpretation of the provisions of the contract regarding the payment of liquidated damages. The printed portion of the contract form that was used in the transaction purports to lay down rules for the ascertainment of damages upon any breach of the contract by the buyer. It states (1) that as to any goods "shipped" which the buyer wrongfully refuses to accept or pay for, the seller may within 90 days resell the same at public or private sale, and recover from the buyer the difference between the contract price and the price obtained on resale, plus the incidental expenses connected therewith; (2) that "as to any of above wheat flour *remaining unshipped* by reason of buyer's breach," the seller shall recover damages to be computed as follows: (a) four cents a bushel for the number of bushels required to manufacture "such unshipped flour," calculating 4¾ bushels of wheat to each barrel of flour; *plus* (b) two cents a bushel for each thirty days between the date of the contract and the date of the breach; *plus* (c) the amount of decline in the price of No. 1 Northern Spring Wheat in Minneapolis "from date hereof to date of breach." Another clause of the contract provides that as to any of the goods which remain "unshipped" because of the failure of the buyer to "furnish shipping directions" within the time limited in the contract, the seller shall have the right to "extend the shipping date thirty days, *and thereafter* (as long as buyer's said failure or refusal continues) *continue the life hereof by as many such*

*successive extensions as seller may .desire.''* It appears from the evidence that nothing whatever was done by either party after defendant told Balch on November 20, 1920, that he would not take any more of plaintiff's flour from the warehouse, until a five days' notice, expiring on March 23, 1921, was served on defendant by plaintiff. In such notice the plaintiff stated, as to the remainder of 1,215 barrels "upon which you have never furnished us with shipping directions and it has not, for that reason, been shipped, but we have continued to carry the contract for you," that *"the contract has been allowed to automatically extend itself for thirty days at a time"* from November 23, 1920, until March 23, 1921, under the provisions above mentioned. Evidently the witness who made the computation of damages assumed that all of the 1,215 barrels remaining in the warehouse were to be treated as "unshipped," which assumption, as to at least 370 barrels for which defendant held the plaintiff's orders, was not warranted by the facts. The witness makes the same error in including such barrels in the total number of barrels as to which no "shipping directions" had been given. Clearly, as to such flour, the breach occurred on November 20, 1920 (when defendant told Balch he "was through" and would not take another bag) and not four months later. Upon these erroneous assumptions, the witness computed damages as follows: first, four cents a bushel for 5,771¼ bushels of wheat (the amount required to make 1,215 barrels of flour), $230.85; second, twelve cents a bushel, amounting to $692.55, under clause (b) above stated; and third, ninety-eight and one quarter cents per bushel, aggregating $5,670.25, representing the decline in the price of wheat between September 23, 1920 (the date of the contract), and March 23, 1921 (which plaintiff claims was the date of the breach).

In the absence of any evidence to the contrary, it may fairly be assumed, we think, that the market price

of flour at any particular time and place will be reflected by the market price of wheat prevailing at such time and place. The amount of "liquidated damages" fixed by the contract, however, includes not only the amount of the decline in the market price of wheat from the date of the contract to the date when, under the peculiar language of the contract, the contract may be terminated by the seller "after as many successive extensions as seller may desire," but also includes additional sums as damages, amounting to sixteen cents a bushel of wheat, or seventy-six cents a barrel of flour, for no apparent reason except to impose a penalty upon the buyer for his breach of the contract. It is competent for the parties to a contract to agree upon the payment of a stipulated sum as damages for a breach thereof; and if such damages are of an uncertain nature and the amount stipulated fairly represents reasonable compensation for the breach, the amount fixed by the parties will ordinarily be sustained by the court. But in determining whether a provision for such damages shall be treated as an agreement for liquidated damages, or merely for a penalty, the courts of this State lean towards a construction which excludes the idea of liquidated damages and permits the parties to recover only damages actually sustained. "This and all other courts seem to agree upon the principle that a stipulated sum will not be allowed as liquidated damages unless it may be fairly allowed as compensation for the breach." (*Advance Amusement Co. v. Franke,* 268 Ill. 579, 582.) Where, by the terms of a contract, the damages are not difficult of ascertainment and the stipulated damages are unconscionable, a provision for such damages will be regarded as a penalty. (*Radloff v. Haase,* 196 Ill. 365; *Advance Amusement Co. v. Franke, supra.*) When the subject-matter of a sale is such a staple article as flour, we cannot see any difficulty in ascertaining the damages according to the ordinary rule,

viz., the difference between the contract price and the market price of the goods sold.

The actual breach of the contract by the defendant occurred on November 20, 1920, when plaintiff's agent was notified that defendant would not proceed further under the contract. Plaintiff was not bound to accept or act upon this notice as creating a breach (*Kadish v. Young, supra*); it could elect to keep the contract alive for the benefit of both parties until the time fixed for the performance thereof (*Lake Shore & M. S. Ry. Co. v. Richards,* 152 Ill. 59, 80; *Chicago Washed Coal Co. v. Whitsett,* 278 Ill. 623, 627). The time fixed in the contract for performance was on or before November 23, 1920. The plaintiff not only elected to keep the contract alive up to that date, but without any notice to defendant, elected to keep it alive *for four months thereafter,* under the supposed authority of the contract, during all of which time, as may be fairly inferred from the evidence, the market price for wheat and flour was going down. To permit the plaintiff under such circumstances to recover, in addition to the amount ordinarily allowed as compensatory damages, a penalty of *two cents per bushel per month for four months,* on account of such delay on the part of the plaintiff, would, in our view, be unreasonable and unconscionable. "It is a general rule of law that it is the duty of a party injured by a breach of contract to do all that is reasonably in his power to prevent the damage or reduce it to the smallest amount." (*Cedar Rapids & I. C. Ry. & Light Co. v. Sprague Electric Co.,* 280 Ill. 386.) We are of the opinion that the provisions of the contract purporting to authorize the recovery of such "liquidated damages" must be construed as imposing a penalty instead of reasonable compensation for a breach thereof, and that the court erred in adopting the opposite view.

We may also add that as to all flour that was included in the written orders given by plaintiff to the

defendant, and under which the defendant had been removing goods from the warehouse at the time the mistake occurred, such flour cannot be considered, in any manner, as flour "remaining unshipped." For the reason already stated, at least 1,005 barrels of the flour in the warehouse had been "shipped" and were legally in the possession of the defendant at the time the defendant refused to take any more from the warehouse. As to such flour, therefore, it is clear that the provisions for liquidated damages as to "unshipped" flour cannot apply. There is no evidence to show when such flour was resold. If it was resold before this suit was brought, the measure of damages was the contract price of such flour, less the price realized upon such resale, provided such resale was fairly made in the open market. That is the language of the contract as to "shipped" goods, and seems to fairly represent the actual damages sustained as to such flour. As against the latter amount, defendant should be allowed for the amount he paid for the 80 barrels of this lot which he returned to the warehouse after paying for the same.

For the reasons stated, the judgment of the municipal court will be reversed and the cause remanded, with leave to the parties to amend their pleadings, if they shall be so advised.

*Reversed and remanded.*

GRIDLEY, P. J., and BARNES, J., concur.