Alexander **STAVRIDES** and Marcia M. Stavrides, his wife, et al.,
Plaintiffs,

v.

**MELLON NATIONAL BANK & TRUST COMPANY** et al., Defendants.

Civ. A. No. 72-242.

United States District Court,
W. D. Pennsylvania.

Jan. 4, 1973.

Sheinberg, Raphael & Sheinberg, Michael P. Malakoff, James H. Joseph, Berger, Kapetan, Joseph & Malakoff, P. C., Pittsburgh, Pa., for plaintiffs.

Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Jones, Gregg, Creehan & Gerace, Dickie, McCamey & Chilcote, Thorp, Reed & Armstrong, Reed, Smith, Shaw & McClay, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Campbell, Thomas & Burke, McCloskey, Best & Leslie, Gault, O'Donnell & Leas, Clarence B. Nixon, Jr., M. J. Arnd, Pittsburgh, Pa., Wolf, Block, Schorr & Solis, Cohen, Philadelphia, Pa., John A. Virostek, Hollinshead & Mendelson, Pittsburgh, Pa., Charles F. Hodel, Cheswick, Pa., C. John Tillman, C. R. Capone, C. Francis Fisher, C. Bryson Schreiner, Robert J. Grier, II, Joseph M. McClure, John R. McCaw, and George R. Craig, Pittsburgh, Pa., for defendants.

## OPINION and ORDER

McCUNE, District Judge.

This suit is a class action asserted on behalf of eighteen named plaintiffs and all other persons similarly situated against all lending institutions in the four-county[1] Pittsburgh, Pennsylvania Standard Metropolitan Statistical Area (SMSA) nominally represented by 23 savings and loan associations, one savings bank, four national banks, and the Federal National Mortgage Association (FNMA, "Fannie Mae")[2] which use the accounting methods complained of in the complaint.

The claims asserted in the complaint arise out of the practice of the defendants of requiring mortgagors, in connection with mortgage loans, to establish and maintain accounts with the defendant banks into which plaintiffs are required to deposit each month payments equal to one-twelfth of the annual taxes levied against the mortgaged premises and one-twelfth of the annual premium for fire insurance on the property. Out of these accounts the defendants pay the taxes and insurance on the property mortgaged. The defendants pay no interest on the account balances; nor do they deduct such accumulated balances from the unpaid principal debt balances when calculating the interest owing by the plaintiffs while these amounts are in deposit in their institutions, i. e., they do not "capitalize" the accounts. Funds accumulated in the tax and insurance accounts are not held separately but are commingled with the general funds of the bank.

---

1. The counties are Allegheny, Beaver, Washington and Westmoreland.

2. All defendants have joined in this motion to dismiss and in the brief supporting it.

Plaintiffs estimate that approximately 250 lending institutions use this accounting method and that they write total mortgage loans of approximately $750,000,000.00 per year in the Pittsburgh SMSA.

The class of plaintiffs is defined as all property owners who have borrowed money from the representative and class defendants against the security of mortgages of real property to the representative and class defendants.

Plaintiffs allege that the lending practices are violations of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1–7; the Consumer Credit Protection Act ("Truth-in-Lending Act"), 15 U.S.C. § 1601 et seq; and Pennsylvania State Law relating to usury, unjust enrichment and breach of fiduciary duty.

This suit is now before the court on defendants' motion to dismiss which asserts that the court has no jurisdiction over the subject matter of the Sherman Act claim; that the Truth-in-Lending and Sherman Acts claims fail to state a claim upon which relief can be granted; and that the state law claims are not a proper subject for the exercise of pendent jurisdiction.

## I

We shall deal first with counts 1, 2, and 3 of the complaint [3] which allege violations of the Sherman Act. The Sherman Act counts can be summarized as follows:

The first count alleges that the defendants entered into an unlawful combination and conspiracy on or about January 1, 1960, to stop their former practice of deducting the monthly tax and insurance payments from the principal debt balance of the loan, i. e., "capitalizing," and to begin to account for such payments in so called "escrow" accounts bearing no interest and that this conspiracy restrained trade.

The second count alleges that the extension of credit is conditioned on the deposit by the borrower of escrow funds and that conditioning the extension of credit to an escrow payment requirement is an illegal tying arrangement.

The third count alleges that the banks would not extend credit unless the borrowers would offer to make escrow deposits and that maintaining an escrow payment requirement as a condition of securing credit is an illegal reciprocal dealing arrangement.

■ A. The defendants argue in their motion to dismiss that counts 1, 2 and 3 of the plaintiffs' complaint do not fall within the subject matter jurisdiction of the court because the mortgage practices in question are local, not in or affecting interstate commerce and, therefore, beyond the pale of the Sherman Act.

Residential mortgage loans, the defendants argue, are primarily local in nature. "The absence of the significant interstate commerce is a function of the nature of the banking transaction involved and of the local character of real estate. Where banks are engaged with non-commercial borrowers and individual depositors such as the plaintiffs here, any interstate impact of that portion of their business is both *deminimis* and incidental." (Defendant's Brief, p. 8).

We hold, however, that the requisite connection with interstate commerce has been well-pleaded. Strictly speaking, the defendant banks' involvement in residential loans, by itself, may be wholly intrastate. However, we will not assume at this stage of the suit that the defendants do not receive some increase in assets or profits as a result of their residential mortgage business and that these increased assets and/or profits do not make their way through the normal course of the banking business into interstate commerce. See Bank of Utah v.

---

3. Plaintiffs' complaint was dismissed by the Court with the consent of both parties. Plaintiffs then filed the "First Amended Substituted Complaint," which is in issue here. For convenience we shall refer to it simply as the complaint.

Commercial Security Bank, 369 F.2d 19, 22 (10th Cir. 1966).

■ Where, as here, jurisdictional issues rest on factual disputes the plaintiffs should have an opportunity to prove that the practices in question do, in fact, have a substantial effect on interstate commerce. McBeath v. Inter-American Citizens for Decency Com., 374 F.2d 359 (5th Cir. 1967), cert. denied, 389 U.S. 896, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967). Fireman's Fund Ins. Co. v. Railway Express Agency, 253 F.2d 780 (6th Cir. 1958). For purposes of this motion we assume the truth of the allegations, of course.

Defendants' motion for dismissal on counts 1 and 2 and 3 because of lack of jurisdiction over the subject matter is denied.

B. Defendants also move to dismiss count 1 because it fails to state a claim on which relief can be granted.

Count 1 alleges that the change from the "capitalization" method of accounting to the "escrow" method by the representative and class defendants on or about January 1, 1960, was the result of an unlawful combination or conspiracy in violation of the Sherman Act. Count 1 further alleges that the representative and class plaintiffs "have been damaged to the extent of the increase of the effective applicable annual interest rate on their principal debt balances occasioned by the aforesaid change from the 'capitalization' to the 'escrow' method of accounting. . . . " ¶18.

■ An alleged conspiracy or combination, if proved, constitutes a *per se* violation of the Sherman Act. Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). For an aggrieved party to state a claim for relief under the Sherman Act it is necessary

to allege only a per se violation of the act and, in a treble damage action, resultant damage. Radiant Burners, Inc. v. Peoples Gas Lgt. and Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); McBeath v. Inter-American Citizens for Decency Com., *supra*. The plaintiffs' complaint satisfies both requirements. Consequently, defendants' motion to dismiss count 1 for failure to state a claim upon which relief can be granted is denied.

C. Count 2 alleges that the practice of the defendants of requiring plaintiffs to establish escrow accounts as a condition of securing home mortgage loans is an illegal tying arrangement in violation of the Sherman Act.

Defendants argue that count 2 of the complaint should be dismissed for failure to state a claim upon which relief can be granted because such an arrangement does not constitute "tying."

■ Tying arrangements [4] involve situations where the seller can use his power over the tying product to win customers that would otherwise have constituted a market available to competing sources of the tied product. Fortner Enterprises v. United States Steel, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). In effect, the seller says to the buyer, "I will sell product 'X' to you only if you also buy product 'Y' from me." Plaintiffs argue that defendants here use credit [5] (the tying product) to sell escrow or short-term deposit services (the tied product).

Defendants, in their motion to dismiss, argue that there can be no tying arrangement here because, among other reasons, only one product—money—is involved. Plaintiffs, of course, argue that there are two products involved—credit and escrow services.

4. Like combinations or conspiracies in restraint of trade, tying arrangements have been held to be a *per se* violation of § 1 of the Sherman Act if not an insubstantial amount of commerce is involved. International Salt Company v. United States, 332 U.S 392, 68 S.Ct 12, 92 L.Ed. 20 (1947). United States v. General Dynamics, 258 F.Supp. 36 (S.D. N.Y.1966).

5. It has been held that credit can be a tying product. Fortner v. United States Steel, *supra*.

Whether or not there is a separate escrow services or short-term deposit market, whether the defendants are selling one product or two, whether there is any legitimate business justification for the escrow requirement, and whether the escrow service is an ancillary part of the loan itself are clearly questions of disputed fact. Disputed facts cannot be resolved on a motion to dismiss, but must await adjudication at trial, Scozzafava v. United States, 199 F.Supp. 43 (S.D.N. Y.1961).

■ While the allegations of the complaint in this regard are highly unusual, we are not convinced that plaintiffs are absolutely unable to prove any set of facts in support of their claim which would entitle them to relief. It will have to be determined whether there are two products or only one; whether the banks actually engage in the practice of selling escrow service; whether the banks condition the extension of credit on the obtaining of the escrow service business from those to whom they extend credit, or whether, as the banks argue, the purpose of requiring the payment of tax and insurance money is simply to make sure that taxes and insurance premiums are paid. Consequently defendants' motion to dismiss count 2 for failure to state a claim upon which relief can be granted is denied. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L. Ed.2d 80 (1957).

D. Plaintiffs allege in count 3 that the arrangement by which they are required, as a condition to the extension of credit, to establish and maintain accounts with the representative and class defendants, into which they make monthly tax and fire insurance deposits, is a reciprocal dealing agreement in violation of the Sherman Act.

We do not think the practices which serve as the basis of count 3 can be properly classified as "reciprocal dealing agreements" as that term is usually defined.

■ In its broadest meaning "reciprocity" describes the practice whereby a company, overtly or tacitly, agrees to conduct one or more aspects of its business so as to confer a benefit on the other party to the agreement; the consideration being the return promise in kind by the other party.[6] United States v. General Dynamics, 258 F.Supp. 36 (S. D.N.Y.1966). It is basically a policy of favoring one's customers in purchasing commodities sold by them. United States v. Penick and Ford, Ltd., 242 F. Supp. 518, 521 (D.N.J.1965). Reduced to its simplest equation it means "You scratch my back and I'll scratch yours" or "I'll buy from you only if you buy from me."

■ Plaintiffs' argument that the practices in question involve a reciprocal dealing arrangement is concisely stated in their brief (p. 39); "Only by establishing an interest-free account with defendant banks could plaintiffs secure credit to purchase a home. . . . The plaintiff-borrowers, hungry for mortgages, are happy to open an interest-free account *quid* in exchange for credit *quo*. The swap is known as reciprocity."

We disagree. These practices, even if proved at trial, would not establish a reciprocal dealing arrangement as defined above. We think the concept of "reciprocity" would be stretched too far if we were to hold that the plaintiffs' willingness to open interest free accounts was a "product" which they "sold" in the course of a mutually beneficial relationship with the banks.

Therefore, plaintiffs' motion to dismiss count 3 for failure to state a claim is granted.

## II

Counts 4, 5, and 6 of the plaintiffs' complaint deal with alleged violations of

---

6. Reciprocal dealing agreements, whether voluntary or coercive, violate the Sherman Act because of their clearly anti-competitive effects. United States v. General Dynamics Corp., *supra*.

the Truth-in-Lending Act which result from the defendants' lending practices.

A. In Count 4, plaintiffs allege that the defendants failed to disclose credit terms before the extension of credit as required by 15 U.S.C. § 1639.[7] The complaint alleges that the required disclosures are first made at closing and that this is a violation of the act. Defendants answer that the disclosures required by the act can properly be made at the mortgage closing and need not be revealed before.

Section 1601 of the Act states that it is the "purpose of this subchapter to assure a meaningful disclosure of credit terms so that the customer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." [8]

After this broad statement of policy the Act goes on to deal with specific forms of credit and credit abuses. Section 1637, for instance, deals with open end credit (i. e., credit cards); § 1638 with retail credit sales (i. e., the installment purchase); and § 1639 with consumer loans not under open end credit plans (i. e., loans from banks, finance companies, etc.). The legislative history reveals very clearly the intent of Congress to enact legislative remedies which reflected commercial realities. Consequently, there are significant differences among §§ 1637, 1638 and 1639.[9]

It was very clearly the intent of Congress, over vigorous dissent, not to enact uniform, blanket provisions to cover all methods of extending credit. The peculiarities of each credit plan and lending situation were taken into account.[10]

Having mentioned the care Congress took to tailor credit reforms to commercial realities we now turn to the disclosure requirements as they apply to mortgage lending. We think it would be very unusual that a mortgagor would be called upon to execute a mortgage and bond without some prior notice of its terms. But even if this were to occur we think disclosure of the terms of the loan in the mortgage papers just before closing would be adequate disclosure under § 1639.

A comparison of §§ 1637, 1638 and 1639 demonstrates that § 1639 contains the same disclosure requirements as § 1638, while § 1637 requires more complete disclosure. These differences, of course, reflect the peculiarities of differing forms of credit. Section 1638 deals with the ordinary credit sale which commonly occurs when one buys a car or appliance on a garden-variety deferred payment or installment plan. In this situation Congress apparently provided that the terms of the loan could be revealed before the credit was extended (just before the buyer signed the papers in the dealer's office) and could be disclosed in the loan papers themselves.

7. Consumer loans not under open end credit plans—Required disclosures by creditor

(a) Any creditor making a consumer loan or otherwise extending consumer credit in a transaction which is neither a consumer credit sale nor under an open end consumer credit plan shall disclose each of the following items, to the extent applicable: . . . .

(5) The finance charge expressed as an annual percentage rate. . . .

Form and timing of disclosure

(b) Except as otherwise provided in this part, the disclosures required by subsection (a) of this section shall be made before the credit is extended, and may be made by disclosing the information in the note or other evidence of in-

debtedness to be signed by the obligor. 15 U.S.C. § 1639.

8. See also 12 C.F.R. § 226.1(a)(2) for a similar statement of purpose.

9. In § 1637, for example, general information about interest rates must be revealed before the purchase and specific information regarding the total amount due, finance charges, etc., must be revealed on each bill after purchase. Likewise, while the amount of the finance charge must be revealed in open end and retail credit, it need not be disclosed on a first lien on a house. There are also differences in provisions for cancelling credit contracts.

10. See 1968 U.S.Code Cong. & Admin. News, p. 1962 et seq.

This disclosure requirement was obviously designed to conform to the realities of the commercial world where people buy their cars and appliances on the spot.

We think the exact same disclosure language of § 1638 when used in § 1639 must be given the exact same interpretation. It is apparent therefore, that Congress intended that mortgage terms could be revealed in the mortgage papers just before credit was extended and the loan consummated.

If Congress had intended so great a departure from the usual commercial practices of mortgage financing as plaintiffs urge here we think that somewhere in the statute or legislative history it would have been spelled out. We have found no evidence, however, of such an intent. The broad language of § 1601 which sets out the purpose of the Act cannot be used to overrule the more specific language of § 1639.

The two cases cited by the plaintiffs do not compel the opposite conclusion. Ratner v. Chemical Bank New York Trust Company, 329 F.Supp. 270 (S.D.N.Y. 1971) dealt with § 1637, the credit card situation, and in § 1637 the time of disclosure is spelled out. Bissette v. Colonial Mortgage Corp., 340 F.Supp. 1191 (D.C. Dist. of Col.1972) followed Ratner even though Bissette dealt with a mortgage under § 1639. We submit that Ratner while good law in a § 1637 case is not applicable to a § 1639 case where disclosure may be made just before closing.

Defendants' motion to dismiss Count 4 is granted.

B. The fifth count alleges that the defendants failed to disclose the true annual percentage interest rate [11] on loans made to the plaintiffs because they failed to include in its computation the amounts required to be paid on account of insurance premiums and taxes.

There is no dispute that if the defendants held the tax and insurance payments in trust or in a separate account the payments would not have to be included in the computation of the annual percentage interest rate.[12]

Problems arise here, however, because the defendants allegedly do not put the monthly tax and insurance payments into a separate account. Instead the payments are alleged to be commingled with other bank assets, invested, and the investment profits retained by the banks.[13]

Therefore, the initial question we must decide before determining whether defendants failed to disclose the true annual percentage interest rate is whether the defendants maintain "escrows for future payment of taxes and insurance" for purposes of the Truth-in-Lending Act. The plaintiffs would have us require that the funds be segregated in a so called trustee account or agent's account but they admit that, if the funds were segregated, the banks would not be

---

11. The annual percentage interest rate is determined by the following formula:

$$\text{Annual Percentage Interest Rate} = \frac{\text{Finance Charge}}{\text{Amount Financed}} \times 100.$$

12. 15 U.S.C. § 1605(e)(3) excludes from the computation of the finance charge "escrows for future payments of taxes and insurance."

12 C.F.R. § 226.4(e) of the Federal Reserve Regulations provides that "an escrow or trustee account for future payment of taxes (and) insurance . . ." need not be included in the computation of the finance charge "provided they are bona fide, reasonable in amount, and not for the purpose of circumvention or eva-

sion of this part of the Act" (i. e., method of calculating the finance charge).

13. Both plaintiffs and defendants agree that if the banks, in fact, maintain escrows for purposes of the § 1605(e)(3) exemption they need not pay interest on the escrow accounts or credit any portion of the investment profits earned thereon to the plaintiffs' accounts. See C.C.H. Consumer Credit Guide, ¶30,882.

"Plaintiffs agree with defendants that they do not have to disclose the loss of interest in the annual percentage rate on an escrow account for future taxes and insurance." Letter to the court by plaintiffs' attorney, Michael P. Malakoff, Esq., dated October 19, 1972.

required to account for and pay interest to the borrowers on the segregated funds. We do not think that the purpose of the Truth-in-Lending Act is to require labeling of the funds or to require the payment of interest on such funds. The Act does not require that the funds be labelled. It merely characterizes the purpose of such funds by the use of the term "escrow." The purpose of such funds is to pay taxes and insurance.

Considering the purpose of the Act it seems to us irrelevant that the defendants fail to keep the monthly tax and insurance payments in a separate account.[14] The creditor's opportunity to shop for credit, which the Act protects, is not impaired whether the funds paid in for taxes and insurance are segregated or not.

Insofar as the purposes of the Truth-in-Lending Act are concerned, the defendants' "escrow" practices are therefore not objectionable in our view.[15] The amount of the monthly payments is reasonable—only enough to pay the property taxes and insurance; there is a bona fide business purpose—to avoid a prior tax lien on their collateral; and the purpose of maintaining "escrows" does not appear to be to evade the requirements of the Act.

Defendants' motion to dismiss count 5 is granted.

C. .Defendants have moved to dismiss count 6 for failure to state a claim. In their brief (p. 2), plaintiffs agree that ". . . Defendants' motion to dismiss (count 6) . . . should be granted."

Accordingly, count 6 is dismissed without comment.

## III

We deal next with plaintiffs' State Law claims (counts 7, 8, and 9) asserted to be pendent to the Federal Anti-Trust and Truth-in-Lending claims, namely, usury, unjust enrichment and breach of fiduciary duty.

The standards the Federal Courts are to apply in deciding whether to exercise jurisdiction over state law claims said to be pendent to a Federal cause of action are set out in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *Gibbs* held that the District Court should consider whether the State and Federal claims derive from the same "common nucleus of operative fact" and whether "a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding." United Mine Workers v. Gibbs, *supra*, at 725, 86 S.Ct. at 1138.

The remaining Federal counts having been dismissed, counts 1 and 2 are the only Federal claims still at issue here. They involve, respectively, the existence of a combination or conspiracy, and the existence of a tie-in. These Federal claims, it seems to us, have a quite different factual and legal basis from the state law claims.

If we had denied defendants' motion to dismiss count 5 and the terms and conditions of the mortgage loans had become an issue then it might have been proper for us to exercise our pendent jurisdiction. There then would have been that "common nucleus of operative fact"

---

14. "The general focus (of the statute), then, is on making various credit options known and understandable to the consumer, before he decides among them . . . " Ratner v. Chemical Bank New York Trust Company, *supra*.

15. Our concern here is with the definition of "escrow" as it relates to the remedial purposes of the Truth-in-Lending Act. Consequently, plaintiffs' reliance on Liberty National Life Insurance Co. v. United States of America, 463 F.2d 1027, 5th Cir., 1972, as it discusses "escrow" for purposes of the Internal Revenue Code is misplaced.

on which to base a legal evaluation of all aspects of the defendants' mortgage lending practices.

We do not think, however, that the remaining Federal claims have sufficient factual and legal issues in common with the state claims to merit trying them together. Therefore, we will not exercise pendent jurisdiction over the state law claims. Counts 7, 8 and 9 are dismissed for lack of jurisdiction.

In summary, our rulings on defendants' motion to dismiss count 1 through 9 of the plaintiffs' complaint are as follows:

Count 1 — denied
Count 2 — denied
Count 3 — granted
Count 4 — granted
Count 5 — granted
Count 6 — granted
Count 7 — granted
Count 8 — granted
Count 9 — granted

Whether this action may be maintained as a class action and the identity of the parties to the action will be determined by separate orders after hearing relevant to that subject which will be held as soon as it can be conveniently scheduled.

▬ Finally, it is necessary to add a separate ruling as to Federal National Mortgage Association. It does not lend money to mortgagors but purchases mortgages in the secondary market from mortgage lenders (see Title III, National Housing Act, 12 U.S.C. §§ 1716, 1719). Both Sherman Act counts rest upon an allegation that defendants lend money. In our view, it is obvious that neither count states a cause of action against FNMA. Accordingly, all counts are dismissed as to FNMA.

It is so ordered.