RICHARD H. FARRELL, JR., *et al.*, Plaintiffs-Appellants, *v.* LINCOLN NATIONAL BANK *et al.*, Defendants-Appellees.

(No. 57903;

First District (1st Division)—October 7, 1974.

Sidney A. Karasik, of Chicago, for appellants.

Nathan N. Powell, of Chicago (Marovitz, Powell, Pizer & Edelstein, of counsel), for appellee Lincoln National Bank.

Myron Lieberman and Robert L. Schlossberg, of Chicago (Lieberman, Levy, Baron & Stone, of counsel), for appellees Bankers Consultants Corporation, Bankers Consultants Corporation-North, Mortgage Service Corp., and Craig L. Opper.

Mr. PRESIDING JUSTICE EGAN delivered the opinion of the court:

The plaintiffs, Richard H. Farrell, Jr., and Kristi L. Farrell, filed a class action complaint against Lincoln National Bank (hereafter the Bank), Bankers Consultants Corporation, Bankers Consultants Corporation-North and Mortgage Service Corporation (hereafter the Brokers), and Richard Dryer and Craig L. Opper. A summons was never served on Dryer.

On August 18, 1971, the court dismissed the complaint against the Bank as a class suit. The plaintiffs then filed an amended complaint, and on

January 17, 1972, the court dismissed the entire complaint as to Craig L. Opper and part of the complaint as to the Brokers. Both sides filed motions for summary judgment and on June 14, 1972, the court allowed the motion of the defendants and denied the plaintiffs' motion. The plaintiffs appeal from the order dismissing their class action complaint, the order dismissing Opper, the order granting the defendants' motion for summary judgment and the order denying the plaintiffs' motion for summary judgment.

The record consists of the pleadings, affidavits, depositions, exhibits and answers to interrogatories. It discloses the following:

On January 12, 1966, the plaintiffs had borrowed $17,900 from Home Federal Savings & Loan Association of Chicago and had given a mortgage on their residence as security. In April, 1970, the plaintiffs borrowed $3500 from Harris Mortgage Loan Corporation secured by a junior mortgage on their residence. The Harris mortgage loan was for a period of 30 months payable in monthly installments of $148.14 including interest at an annual rate of 19.5%.

On January 18, 1971, Richard Dryer, representing Bankers Consultants Corporation, called the plaintiffs. He told them that he knew that they had a loan with Harris Loan Company, that he could secure a loan for them through a bank and that they would be paying the bank interest rates which were much lower than the rates they were paying to Harris, thus saving a few hundred dollars on the interest. The plaintiffs testified in their depositions that Dryer made it clear that the bank would pay their fee and that the plaintiffs would not be required to pay them anything.

They went to the officers of Bankers Consultants Corporation at 10400 Higgins Road in Rosemont and met the defendant Craig L. Opper, who explained the advantages of consolidating their debts and paying them off with a single bank loan. The plaintiffs signed a "Retention Authorization" by the terms of which the plaintiffs authorized Bankers Consultants to negotiate a bank loan in the amount of $4300 "or such other amount as might be mutually satisfactory"; the loan was to be negotiated at a State or national bank only; the net proceeds of the loan after payment of costs and "the fee of Bankers Consultants Corporation" would be $3775. The loan payments, including credit life insurance and all costs, were not to exceed $118.61 per month and the term of the loan was not to exceed 4 years. The collateral was to consist of a trust deed on the plaintiffs' residence. The agreement also provided:

> "In the event that the said loan is successfully negotiated for and is accepted by the undersigned, the undersigned agrees to pay to Bankers Consultants Corporation an amount equal to $525 to cover

its fee and all costs which it will incur. * * * Bankers Consultants Corporation is authorized to cause the bank to disburse said amount to the order of Bankers Consultants Corporation from the principal amount of the loan at the same time as the net proceeds of the loan are paid to the undersigned.

* * *

Unless a loan commitment, in accordance with the above terms, is obtained by Bankers Consultants Corporation and is accepted, there shall be no obligation on the part of the undersigned. The undersigned acknowledges that he has signed this authorization after carefully considering the terms hereof and that he has received a copy thereof."

Mrs. Farrell testified that when Opper mentioned a $500 service charge she was "kind of taken aback for a few minutes because the man on the phone said there would be no charge at all." Opper explained that the $500 would be part of the loan and that the Bank would be lending them the money to pay for the service charge. Mr. Farrell testified:

"I couldn't believe that somebody would go to all this trouble for nothing, so then it came up with his fee would be $525.

First he said, $500 then he corrected himself and said $525.

Now, I went in there thinking there was no charge. He convinced me this was a way out of debt. I could get my head above water and if I could stay clean for five years, I would be out of debt, so then he gave us this retention authorization form, I asked him, 'If we sign this, does this mean we owe you the $525 whether or not we can get the loan or not,' and he stated, 'If you don't get the loan you don't owe us a thing, but if on the other hand, I go ahead and do your credit check and everything like that and you change your mind I can't do this for nothing.'

He didn't say, 'You would have to pay me.' He says, 'I can't do it for nothing, so if you don't want the loan or you are not interested in it, don't sign it,' so my wife and I put our heads together for a minute and we decided that we were at the end of the rope so we better give it a try, so we signed it."

On February 12, 1971, Bankers Consultants negotiated a loan on behalf of the plaintiffs with Lincoln National Bank. The loan was evidenced by an installment note in the total sum of $5693.28 payable in 48 monthly installments of $118.61 including certain "add-on" finance charges at a purported annual percentage rate of 19.75%. The loan was secured by a trust deed on the plaintiffs' residence.

Lincoln National delivered to the plaintiffs a document purporting to be a full disclosure of information concerning the particulars of the loan

as required by the Federal Truth-In-Lending Act (15 U.S.C. § 1601 *et seq.* (1970)) and Regulation Z thereunder as well as the Illinois Interest Statute (Ill. Rev. Stat. 1969, ch. 74, § 4A). That statement showed:

"FINANCE CHARGE, consists of:............$1,770.26

Service Charge ..................$ 525.00

Interest ........................$1245.26"

The plaintiffs' principal argument is that the Brokers were the agents of the Bank; therefore, the fee disbursed by the Bank to the Brokers, listed as a finance charge on the disclosure statement, should not have been included in the total amount on which the plaintiffs were paying interest, but, rather, was itself interest. Thus, the interest charged by the Bank violates the usury statute. Alternatively, whether the Brokers were the agents of the Bank was a question of fact which could not be resolved by summary judgment.

■ It is the settled law in Illinois that "[b]rokers negotiating a loan of another person's money may charge the borrower a commission without thereby making the loan at the full rate of legal interest usurious." (*Council v. Bernard*, 319 Ill. 392, 397, 150 N.E. 272.) But if a fee is paid to a lender's agent for making the loan, with the lender's knowledge, the amount of the fee is treated as interest for the purposes of determining usury. *Fowler v. Equitable Trust Co.*, 141 U.S. 384; *Payne v. Newcomb*, 100 Ill. 611; 35 I.L.P. *Usury* § 5, at 431 (1958).

■■ The burden of proving agency is on the party asserting it (*People & E. Ry. Co. v. Kenworthy*, 7 Ill.App.3d 350, 353, 287 N.E.2d 543); and it must be established by a preponderance of the evidence. (*Abt v. Department of Revenue*, 34 Ill.2d 324, 215 N.E.2d 243.) The nature and extent of an agency are facts to be proved, but the question becomes one of law where the evidence is not disputed. *Marshall Milling Co. v. Rosenbluth*, 231 Ill.App. 325.

The essence of the agency relationship has been described in *Hoffman & Morton Co. v. American Insurance Co.*, 35 Ill.App.2d 97, 102, 181 N.E.2d 821:

"The distinguishing characteristic of an agent is that he represents another contractually. When properly authorized, he makes contracts or other negotiations of a business nature on behalf of his principal, by which his principal is bound. (Mechem, Outlines of the Law of Agency, 1952 Ed, p 4.) An agent is generally defined by the Illinois courts as being one who undertakes to manage some affairs to be transacted for another by his authority, on account of the latter, who is called the 'principal,' and to render an

account. *Dean v. Ketter*, 328 Ill.App. 206, 210, 65 N.E.2d 572 (1946)."

The affidavits of Harold Isaacson, vice president of the three broker-defendants and Henry J. Bertocchini, executive vice president of the Bank, established the following:

Between April, 1970, and September, 1971, the broker-defendants submitted a number of loan applications to the Bank on behalf of the broker-defendants' customers. The Bank played no part in the broker-defendants' decision to submit any application to it. The broker-defendants submitted loan applications on behalf of their customers to more than six other banks. During this period, the Bank made a substantial number of installment loans to persons other than customers of the broker-defendants, including persons who were customers of other loan brokers.

The Bank rejected some of the loan applications submitted to it by the broker-defendants. In other instances, the Bank agreed to make the requested loans but only on terms other than the terms requested by the broker-defendants. Those decisions were made by the Bank after it reviewed the customer's credit information. If the broker-defendants were unable to persuade the Bank to make the requested loan, the broker-defendants attempted in some instances to obtain the loan from another bank. If the Bank desired to make a loan on terms other than those requested, the broker-defendants contacted their customer to determine if the new terms were acceptable. In some instances the new terms were acceptable to the customer, and in some instances the new terms were rejected. When the Bank in its sole judgment considered it necessary, it independently verified the credit information submitted by the broker-defendants and independently obtained further credit information.

.None of the broker-defendants ever had any authority of any kind with regard to the granting of loans by the Bank. The broker-defendants did not guarantee to the Bank or agree with the Bank to be responsible for the accuracy of the credit information which the broker-defendants obtained or the accuracy of the documents evidencing or securing the loans. None of the broker-defendants ever had any authority or responsibility of any kind in connection with the repayment of loans. The broker-defendants never collected or serviced the loans after the loans were made. At no time did they exercise any authority of any kind concerning renewals or extensions of any loans. The decision whether, and upon what terms, to grant a loan was solely that of the Bank. Once a loan was granted, all further decisions and actions in connection with the loan were also the sole responsibility of the Bank.

The decision whether, and upon what terms, to submit a loan ap-

plication to the Bank was solely that of the broker-defendants, based upon such factors as the Bank's proximity to the customer's residence and place of employment, the credit-worthiness of the customer and the broker-defendants' judgment concerning the availability of funds at various banks for the type of loan desired.

The Bank never had any agreement of any kind, written or oral, with the broker-defendants concerning the brokerage fees which they charged their customers, nor did the Bank ever make any decision with regard to the amount or any other aspect of such fees. The Bank never received any portion of the fees. It never suggested in any way how or in what manner the broker-defendants were to obtain payment of the fees. As with the plaintiffs, the broker-defendants and their customers agreed on the amount of the fees, the circumstances under which the fees would be payable and the manner of payment prior to any dealings with the Bank and prior to the decision of the broker-defendants to submit a loan application to the Bank. Although the Bank was aware that the broker-defendants had written authorizations from their customers to negotiate on behalf of the customers, the Bank was not given a copy of the retention authorization and was not specifically informed of its contents. It was the Bank's understanding that the broker-defendants acted on behalf, and were the agents, of their customers.

This testimony clearly establishes that the broker-defendants had no authority to bind the Bank in any manner, nor did the Bank have any right to control the actions of the broker-defendants, and the circumstances the plaintiffs rely on to establish an inference of agency are not sufficient to overcome the affidavits of Isaacson and Bertocchini.

The plaintiffs point to the fact that before the loan was made Bankers Consultants obtained information relating to the financial condition of the plaintiffs, a preliminary title report for the plaintiffs' residence, for which it was compensated by the Bank and similar information important to a lender; that the Bank relied exclusively on the information supplied by the brokers and did not examine the property of the plaintiffs; and that the brokers prepared the notes, the trust deed, the disclosure statement, and the notice of rescission.

It is not unusual, as the Bank points out, for third persons, e.g., home improvement contractors, automobile dealers, real estate brokers, attorneys and accountants to assemble credit information for a lending agency. Could anyone suggest that an automobile dealer, anxious to sell a car to a person who required financing, became the agent of the lender because the dealer compiled credit information for the lender's use? We think not. Nor could the fact that the brokers typed in the blank spaces on the printed documents create an inference of any agency relationship.

Needless to say, a loan broker gets no fee unless the borrower successfully negotiates the loan. The broker may understandably perform any number of accommodations for the lender in an effort to induce him to make the loan. But those acts of accommodation are based on self-interest and not on any desire to further the interests of the lender. A similar argument was made and rejected in *Great Southern Life Insurance Co. v. Williams* (Tex. Civ. App. 1939), 135 S.W.2d 241, 247; in *Merck v. American Freehold Land Mortgage Co.* (1887), 79 Ga. 213, 7 S.E. 265, 268-269; and in *Shaffran v. Holness* (Fla.App. 1958), 102 So.2d 35, 40.

Bankers Consultants was previously known as Steven-Bruce Investment Company. Under that name it had published and circulated a letter stating in part as follows:

"CHICAGO GROUP OF BANKS APPROVED $16 MILLION PROGRAM FOR HOMEOWNERS.

Recently, a group of Chicago Banks appointed Steven-Bruce Investment Co. Loan Representative for a New 16 Million Dollar Bank program.

The Bank funds will be used to offer Homeowners 1 to 5 years, large, personal loans $1500-$7500. The program is designed to stop Homeowners from borrowing money from loan companies and finance companies and to curtail charge accounts and charge cards."

Under the letterhead of Steven-Bruce Investment Company, Brokers Consultants published and circulated a letter dated October 20, 1969, offering to various Chicago-area banks a package "loan arrangement" service whereby Steven-Bruce Investment Company, also known as Bankers Consultants, would perform various services for and as agent for the bank in soliciting loans, preparing and screening loan applications, conducting loan negotiations, investigating credit, evaluation of the loan, preparation of loan documents, and facilitating loan closings.

The plaintiffs contend that this evidence, consisting of statements of the purported agent may be considered to establish the fact of agency. In *Fredrich v. Wolf*, 383 Ill. 638, 640, 50 N.E.2d 755, the applicable rule was stated:

"It is well settled that where the existence of an agency is an issue in a case, where the alleged principal is a party, the mere statements of the agent made out of the presence of the principal and not subsequently approved by him are not admissible to establish the existence of such relationship."

The plaintiffs rely on *Grebe v. Vacek & Co.*, 103 Ill.App.2d 79, 85, 243 N.E.2d 438, wherein the court said:

"The defendant also contends that plaintiff cannot prove that

Rusin was an agent for the defendant by what Rusin said and did, and cites *Sommerio v. Prudential Ins. Co. of America*, 289 Ill.App. 520, 7 N.E.2d 631, for the rule that a supposed agent's statements and acts are incompetent by themselves to prove an agency relationship. We do not disagree with this statement, but an alleged agent's statements are relevant when it is shown that the alleged principal has consented or ratified such statements."

But neither the Bank nor its employees (nor the plaintiffs) had seen the circular before the suit was filed. It was issued without the authority or consent of any bank; it had been distributed almost 2 years before the broker-defendants submitted any loan applications to the Bank and over 2½ years before the loan in question. The letter was in no way a statement of fact that the Brokers were acting as an agent but, rather, was a solicitation by the Broker for the Bank's business.

■■ It is clear that the exhibits are not statements by the Brokers that they were acting as representatives of Lincoln National Bank. But even if so construed, they may not be considered to establish the agency relationship since the record establishes that the Bank never ratified, or consented to, the statements.

As noted, the disclosure statement under the Federal Truth-In-Lending Act and Regulation Z included the broker's fee as a service charge. In their original brief the plaintiffs argued that the Federal Truth-In-Lending Act, Regulation Z (12 C.F.R. § 226.2(f) (1973)) and the Illinois Truth-In-Lending Act do not require that fees paid to other than the lender be disclosed to the borrower. The thrust of the plaintiffs' argument is that, since the Bank did disclose the service charge, the Bank must have considered it as its own fee rather than a third party's. The Bank's brief argues, with appropriate authority cited, that it was required to disclose the fees of all "creditors" under the Federal act and Regulation Z. In their reply brief, the plaintiffs have not answered the argument of the Bank but rely only on the Illinois statute. We deem the plaintiffs' reasoning unpersuasive. If the Federal act requires that the lenders disclose a certain fact and the Illinois act does not require it, we fail to see how compliance with the Federal act can be construed as an admission simply because disclosure was not also required under a state law.

■■ We judge, therefore, that the evidence relied upon by the plaintiffs to support an inference of agency is of no probative value and the evidence so overwhelmingly favors the defendants that any finding of agency could not be permitted to stand. The trial court correctly ruled, as·a matter of law, that the brokers were the agents of the plaintiffs only.

■■ The plaintiffs also contend that the loan violated the Federal and Illinois Truth-In-Lending Statutes on the grounds (1) that the disclosure

was not timely; and (2) the $525 finder's fee was made non-refundable even if the plaintiffs had rescinded. The case relied on by the plaintiffs in their contention that the disclosures were not timely, *Bissette v. Colonial Mortgage Corp.*(D.D.C. 1972), 340 F.Supp. 1191, was reversed in 477 F.2d 1245. The Court of Appeals held that disclosure at the time of closing was timely. See also *Stavrides v. Mellon National Bank & Trust Co.* (W. D. Pa. 1973), 353 F. Supp. 1072.

The Illinois Interest Act on prepayment of a loan requires a partial refund only of interest and insurance charges. As we have pointed out, the finder's fee was not interest. The Federal Truth-In-Lending Act provides, if a borrower exercises his right to rescind, he is not liable for any "finance or other charges." (15 U.S.C. § 1635(b) (1970).) The plaintiffs concede, however, in their reply brief that if the Brokers were solely agents for the borrowers, the fee would not have to be returned in the event of rescission or prepayment. The record fails to show any violation of the Federal or State Truth-In-Lending Statutes.

For these reasons we judge that the trial court properly granted summary judgment in favor of the defendants; and since the plaintiffs cannot successfully maintain their action individually, the class action must thereby fall. *De Phillips v. Mortgage Associates, Inc.*, 8 Ill.App.3d 759, 764, 291 N.E.2d 329.

In view of the foregoing, it is unnecessary for us to determine whether national banks are exempt, as the Bank argues, from State usury laws. The judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE and GOLDBERG, JJ., concur.