BETTE WARGEL, Special Adm'r of the Estate of C. Douglas Wargel, Deceased, Plaintiff-Appellant, *v.* THE FIRST NATIONAL BANK OF HARRISBURG *et al.*, Defendants-Appellees.

Fifth District   No. 82—613

Opinion filed January 13, 1984.

Harris, Lambert and Wilson, of Marion, for appellant.

Charles R. Jelliffe, of Jelliffe & Ferrell, of Harrisburg, for appellee The Lincoln National Life Insurance Company.

Charles M. Ferguson, of Harrisburg, for appellee The First National Bank of Harrisburg.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Bette Wargel, the special administratrix of the estate of C. Douglas Wargel, deceased, appeals from a directed verdict entered in favor of the Lincoln National Life Insurance Company (hereinafter referred to as Lincoln) and the First National Bank of Harrisburg (hereinafter referred to as the bank), defendants, following a jury trial on plaintiff's amended complaint. Count I of the complaint, directed

against Lincoln only, alleged that a policy of insurance issued by Lincoln on the life of C. Douglas Wargel came into effect on September 2, 1978, that C. Douglas Wargel died on September 4, 1978, and that Lincoln has refused to pay the $24,500 due under the policy. Count II alleged, in the alternative, that in the event the policy of insurance was not in effect at the time of C. Douglas Wargel's death, the lack of insurance coverage was attributable to negligent acts on the part of both defendants; namely, Lincoln's failure to act upon C. Douglas Wargel's insurance application within a reasonable time, and the bank's failure to accept a premium payment tendered by Wargel on September 2, 1978. Two remaining counts of the complaint were voluntarily dismissed by plaintiff prior to trial, and are not relevant to this appeal. For the reasons which follow, we reverse the judgment of the circuit court as to count I, and find it unnecessary to consider the questions raised concerning count II.

The evidence offered at trial established that, in the early part of August 1978, C. Douglas Wargel applied to the bank for a loan of $24,500, in connection with his intended purchase of certain real estate located in Gallatin County, Illinois. The loan was approved by the bank, and the documents necessary to the transaction were executed on August 3, 1978. On that same day, Wargel and Linda Watson, an assistant cashier at the bank, filled out an application to Lincoln for decreasing term life insurance covering the mortgage note which Wargel had executed. Wargel signed his name as proposed insured, filled in his height and weight, and marked several "no" boxes in response to questions concerning prior illnesses and hospitalization. Watson filled in the remainder of the application, naming the bank as applicant and indicating the monthly premium amount as $6.13 and the initial amount of insurance as $24,500. Near the top of the application was the following printed language:

> "APPLICATION IS HEREBY MADE TO THE LINCOLN NATIONAL LIFE INSURANCE COMPANY FOR DECREASING TERM LIFE INSURANCE ON THE LIFE OF THE PROPOSED INSURED NAMED BELOW AND THE APPLICANT IS HEREBY AUTHORIZED TO INCREASE THE MONTHLY MORTGAGE PAYMENT OF THE PROPOSED INSURED TO THE EXTENT OF THE PREMIUM THEREFOR. IT IS UNDERSTOOD AND AGREED THAT NO INSURANCE COVERAGE SHALL BE EFFECTED UNLESS AND UNTIL THIS APPLICATION IS APPROVED BY THE COMPANY AND THE FIRST FULL PREMIUM IS PAID DURING THE CONTINUED GOOD HEALTH OF THE PROPOSED INSURED."

On August 3 or August 4, 1978, the application was mailed to Lincoln. Because the application did not contain Wargel's street address, the underwriting clerk who received the application at Lincoln's office, Marjorie Scheumann, did not immediately process it; rather, she wrote the word "street" in red ink on the application and filled out a form requesting the missing information. One copy of the missing information request was sent to Wargel, and another to the bank. The request was dated August 14, 1978. Subsequently, Ms. Scheumann received the white copy of the missing information request back in the mail. "Box 207" was written on the request. On August 24, 1978, the application for insurance was approved by the underwriter, and Ms. Scheumann stamped the back of it accordingly. The application was then mailed to the bank in an envelope postmarked August 31, 1978.

On Saturday, September 2, 1978, C. Douglas Wargel came into the bank and made his first monthly mortgage payment. He asked Linda Watson if the bank had received approval of the insurance application, and was told that it had not. Wargel then offered to pay the $6.13 insurance premium, and Ms. Watson refused to accept the money. It is undisputed that Wargel was in good health at the time he offered payment of the premium.

On Monday, September 4, 1978, C. Douglas Wargel accidentally drowned while wading in the Ohio River. On September 5, 1978, the bank received the approved insurance application in the mail. The bank, believing itself to be the primary beneficiary under the policy, submitted a death claim to Lincoln on January 18, 1979. The claim was denied by Lincoln. Plaintiff Bette Wargel, mother of C. Douglas Wargel and special administratrix of his estate, testified that she had continued to make the mortgage payments on the real estate purchased by her son.

Evidence concerning the relationship between Lincoln and the bank was offered by plaintiff through the testimony of Robert Curtis, the vice-president of the bank. Curtis testified that the bank had been assisting its customers in applying for insurance from Lincoln since approximately 1967, and that Lincoln supplied the insurance application forms to the bank. Also, according to Curtis, the bank used a chart supplied by Lincoln to determine the amount of the premium to be paid by each insured, and sent each insured a policy which was supplied to the bank by Lincoln. Curtis explained that those customers insured through this arrangement made their premium payments to the bank, not to Lincoln, and that these customers "normally" made their mortgage and insurance payments in a lump sum

each month. Upon receipt of the monthly premium payments, bank employees would put them in a special account for each customer. In early November of each year, the bank would receive a bill from Lincoln indicating the total amount which the bank was to remit to Lincoln. Pursuant to the terms of a 1967 agreement between the bank and Lincoln, the bank retained 20% of the total amount of premium payments collected each year. According to this written agreement, which was admitted into evidence, this 20% fee was payable "because of effort expended and the expense incurred by the Administrator [the bank] for calculation and collection of the insured's contribution toward the insurance, maintenance of records of insured debtors, transmission to The Lincoln of the contribution so secured, the issuance of policies to the insured debtors, the processing of death claim notice forms and such other administrative services as Administrator may be called upon to perform." The agreement further stated that the fee was "not intended in any way to be a commission or other means of compensation for the selling of credit insurance."

An additional document entitled "Administrative Guidelines for Mortgage Cancellation Insurance and Mortgage Payment Insurance" was admitted into evidence upon motion of the bank. This document, which Curtis testified that he received from Lincoln, discussed, among other things, methods of soliciting the insurance application, the manner in which the application should be filled out, and the procedures for reporting new insureds to Lincoln and calculating the amount of insurance in force on a given insured at a given time. It instructed the administrator not to accept any money with the insurance application, and indicated that, "[t]echnically, MCI [mortgage cancellation insurance] does not go into force until the first day of a month following underwriting approval and in which the first premium is paid." In response to questioning concerning the solicitation provisions contained in the document, Curtis testified that the bank did make one direct mailing to its customers for the purpose of informing them that the bank was "going into the program" with Lincoln and would be able to assist customers in obtaining insurance.

At the close of all of the evidence, the court granted Lincoln's motion for a directed verdict on count I, finding that the application for insurance was a mere offer which had not been accepted by Lincoln. The court also directed a verdict in favor of both Lincoln and the bank on count II, finding that the evidence showed no negligence on the part of either defendant. Plaintiff's motion for a directed verdict as to count I was denied.

On appeal, plaintiff initially asserts that the court erred in direct-

ing a verdict for Lincoln, and in failing to direct a verdict for plaintiff, on count I of plaintiff's complaint. Plaintiff contends that the evidence established, as a matter of law, that a contract of insurance on the life of C. Douglas Wargel came into existence on September 2, 1978, when Wargel offered to pay his insurance premium to the bank. Since the offer to pay was made to the bank, and not to Lincoln, our analysis must necessarily begin with an examination of the nature of the legal relationship between Lincoln and the bank.

While the written agreement between Lincoln and the bank stated that the bank was not an agent of Lincoln, the legal relationship between the parties must be determined by analysis of their actual practices, and not merely by reference to the written agreement between them (*Tansey v. Robinson* (1960), 24 Ill. App. 2d 227, 233-34, 164 N.E.2d 272). An agent is generally defined as one who undertakes to manage some affairs to be transacted for another by his authority, on account of the latter, who is called the principal, and to render an account. (*Mills v. State National Bank* (1975), 28 Ill. App. 3d 830, 834, 329 N.E.2d 255.) The test of agency is the existence of the right to control the method or manner of accomplishing a task by the alleged agent, as well as the agent's ability to subject the principal to liability. (*Kozasa v. Guardian Electric Manufacturing Co.* (1981), 99 Ill. App. 3d 669, 676, 425 N.E.2d 1137.) While the nature and extent of an agency are facts to be proved, these questions become ones of law where the evidence is not disputed. *Farrell v. Lincoln National Bank* (1974), 24 Ill. App. 3d 142, 146, 320 N.E.2d 208.

Applying these principles to the case at bar, we are compelled to conclude that the evidence establishes, as a matter of law, the existence of an agency relationship between Lincoln and the bank. In administering Lincoln's "program" pursuant to the guidelines set forth in the relevant documents, the bank was substantially under the control of Lincoln. It used applications provided by Lincoln, filled them out pursuant to instructions issued by Lincoln, and accepted premium payments from each insured on behalf of Lincoln. Upon notice of the approval of an application, the bank sent each new insured a policy provided by Lincoln. In late October or early November of each year, the bank was required to account to Lincoln for the premiums it had collected, and to remit those premiums, less the 20% service fee, to Lincoln. Under the terms of the insurance application, the bank was authorized to collect premiums on behalf of Lincoln, thereby obligating Lincoln to continue providing insurance coverage to those insured under its policies. Taken as a whole, these facts unequivocally establish the right of Lincoln to substantially control the method and

manner of the bank's activities pursuant to Lincoln's "insurance program," and, accordingly, also establish the existence of an agency relationship.

Having determined that the bank was an agent of Lincoln, we must next consider the effect of the bank's failure to accept Wargel's tendered premium payment on the question of whether a contract for insurance was in existence at the time of Wargel's death. It appears that the bank, as agent of Lincoln, did not have actual authority to accept Wargel's money prior to the approval of his application, since the written guidelines issued to the bank by Lincoln specifically instructed the bank not to accept money under such circumstances. This instruction, however, was not known to Wargel at any time, and it cannot operate to relieve Lincoln of its contractual obligations toward him or his estate. Rather, it necessitates a further inquiry into whether, at the time Wargel offered his premium payment, the bank, as agent of Lincoln, had apparent authority to accept it on Lincoln's behalf.

"Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds his agent out as possessing—it is such authority as a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." (*Wing v. Lederer* (1966), 77 Ill. App. 2d 413, 417, 222 N.E.2d 535.) The apparent authority of an agent must be based on words and acts of the principal, and not on anything the agent himself has said or done. (*Lawcock v. United States Trotting Association* (1965), 55 Ill. App. 2d 211, 217, 204 N.E.2d 802.) Here, the evidence, particularly the language contained on the insurance application, was such as would convince a reasonably prudent person that the bank was authorized to accept premium payments prior to Lincoln's approval of the underlying application. The application provided that "no insurance coverage shall be effected unless and until this application is approved by the company and the first full premium is paid during the continued good health of the proposed insured." Nothing in this language states, or even remotely suggests, that notification of approval, or even the fact of approval itself, must precede the payment of the first premium by the insured. Indeed, the application strongly suggests the opposite, as it specifically indicates that the bank, as applicant, "is hereby authorized to increase the monthly mortgage payment of the proposed insured to the extent of the premium therefor." This authorization is not made contingent upon approval of the application by Lincoln; rather, the plain meaning of the words used indicates that the bank's

ability to accept Wargel's premium payment arose upon the filling out of the application, and not upon its approval. The law is well settled that a principal is bound equally by the authority which he actually gives to his agent and by that which, by his own acts, he appears to give. (*Nash v. Classen* (1896), 163 Ill. 409, 414, 45 N.E. 276.) Here, having held its agent out as possessing the authority to accept Wargel's premium at any time subsequent to the time of application, Lincoln is estopped as against Wargel from denying the existence of such authority. (See *Faber-Musser Co. v. William E. Dee Clay Manufacturing Co.* (1920), 291 Ill. 240, 244-45, 126 N.E. 186.) Under these circumstances, the fact that Wargel at no time actually paid the premium is irrelevant, for the bank's refusal of his offer to pay operated to relieve him of his obligation to actually do so. See *Needy v. Sparks* (1979), 74 Ill. App. 3d 914, 918, 393 N.E.2d 1252.

 In summary, we hold that the evidence established, as a matter of law, that the bank was an agent of Lincoln for the purposes relevant herein, and that the language used by Lincoln in its insurance application was such as to vest the bank with apparent authority to accept premium payments at any time after the application was filled out by the proposed insured. At the time of C. Douglas Wargel's death on September 4, 1978, everything necessary to create a contract of insurance under the terms expressed in the application had occurred. The application had been approved by Lincoln on August 24, 1978, and Wargel had offered to pay his premium on September 2, 1978, at a time when he was in good health. Since the apparent authority of the bank fully justified Wargel's efforts to pay his premium prior to his death, Lincoln is estopped from relying on the bank's lack of actual authority to accept Wargel's money prior to approval of his insurance application. Thus, the trial court erred both in directing a verdict for Lincoln and in failing to direct a verdict for plaintiff on count I of plaintiff's complaint.

For the foregoing reasons, the judgment of the circuit court of Saline County is reversed. This cause is remanded to the circuit court, which is directed to enter judgment in favor of plaintiff on count I of her complaint, and to calculate plaintiff's damages in accordance with applicable law. In view of our disposition of this case, we need not consider those questions raised with respect to count II of the complaint.

Reversed and remanded with directions.

WELCH, P.J., and KARNS, J., concur.