718

AMY H. HIRST *et al.*, Plaintiffs, v. HARRY L. STACKOWSKI, JR., *et al.*, Defendants (Pilar Brooks *et al.*, Minors, by Diana Brooks, their Mother and Next Friend, *et al.*, Plaintiffs; Harry L. Stackowski, Jr., Defendant and Counterplaintiff-Appellant; Judy Woolcott, Plaintiff and Counterdefendant-Appellee).

Second District   No. 2—89—1262

Opinion filed September 7, 1990.

Daniel E. O'Brien, of McKenna, Storer, Rowe, White & Farrug, of Wheaton (H. Evan Williams IV, of counsel), for appellant.

Richard J. Larson and Bernard K. Weiler, both of Larson, Mickey & Weiler, P.C., of Aurora, Joseph B. Condon, of Condon & Zopp, of Crystal Lake, Donald R. Brewer, of Dundee, and George W. Brannen, of Casey & Brannen, of St. Charles (Constance Burnett Renzi, of counsel), for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant and counterplaintiff, Harry L. Stackowski (Stackowski), appeals from the judgment of the circuit court of Kane County which granted the motion for summary judgment made by Judy Woolcott (Woolcott), a plaintiff and counterdefendant.

Stackowski was, on March 3, 1985, the operator of an automobile which collided with a vehicle driven by defendant, Phillip C. Brooks (Brooks), on Randall Road in McHenry County, Illinois. As a result of that accident, Stackowski was made a defendant in a lawsuit brought by the passengers of both vehicles.

Stackowski brought his counterclaim for contribution, alleging that if he were liable to these passengers, he was entitled to contribution from Brooks on the basis of his status as a joint tort-feasor and that he would, likewise, be entitled to contribution from Woolcott because Brooks was acting as her agent at the time of the accident. The complaint's only references to this alleged principal-agent relationship in count I were as follows:

"10. At the aforesaid occurrence, PHILLIP C. BROOKS was driving CHRISTOPHER LEWIS at the request of JUDY WOOLCOTT for her purpose.

\* \* \*

13. As PHILLIP C. BROOKS was acting as the agent of JUDY WOOLCOTT, HARRY STACKOWSKI is further entitled to contribution from JUDY WOOLCOTT."

On March 3, 1985, Brooks invited Christopher Lewis (Christopher), the son of Woolcott by a previous marriage, to spend the day with his children. On the same day, with Woolcott's permission, he drove Christopher to the home of mutual friends, Frank and Michael Casillas. The Woolcotts intended to pick up Christopher at the day's end. However, their car was inoperable. Woolcott called the Casillas house and spoke to Brooks, who said that he would bring Christopher home. It was not Woolcott's understanding that Brooks would first drop off his children at his ex-wife's Algonquin residence, before bringing Christopher home. Woolcott did not agree to pay any costs that Brooks incurred while bringing Christopher home.

Brooks, upon leaving the Casillas house, drove towards Algonquin to drop off his children at his ex-wife's residence. After driving approximately one mile, Brooks' automobile was involved in the aforementioned collision with a vehicle driven by Stackowski.

Woolcott filed a motion for summary judgment on count I of Stackowski's counterclaim alleging, *inter alia*, that she was neither the owner nor the passenger in the vehicle owned and operated by Brooks and that there was no agency or joint-venture relationship between Brooks and her at the time of the accident. The court below found that there was no principal-agent relationship between Woolcott and Brooks; that Brooks' act of driving Christopher home was social and gratuitous; and that there was no issue of material fact as to Woolcott. Accordingly, the trial court granted Woolcott's motion for summary judgment as to count I of Stackowski's counterclaim.

Eventually all other issues were either settled or dismissed by stipulation of the parties. Only the trial court's granting of Woolcott's motion for summary judgment regarding count I of the counterclaim remained in dispute.

Summary judgment is a drastic and extraordinary remedy, and it must be granted only when the movant's right to judgment as a matter of law is absolutely clear and free from doubt. (*Purtill v. Hess* (1986), 111 Ill. 2d 229.) Summary judgment should be granted by the trial court only when it is satisfied that the pleadings, affidavits, and other evidence present no genuine issue of material fact. (*Knief v.*

*Sotos* (1989), 181 Ill. App. 3d 959.) A trial court must construe the record before it most strictly against the movant; conversely, the court must view the record in a light most favorable to the non-moving party. (*Knief,* 181 Ill. App. 3d at 963.) A reviewing court's task is to determine whether the trial court correctly concluded that there were no genuine issues of material fact, and, if so, whether judgment for the moving party was correct as a matter of law. *International Amphitheatre Co. v. Vanguard Underwriters Insurance Co.* (1988), 177 Ill. App. 3d 555.

▄▄▄ Essentially, Stackowski argues that there was sufficient privity in the relationship of Brooks and Woolcott to impute his negligence to her. (See, *e.g., Palmer v. Miller* (1942), 380 Ill. 256.) Agency is a consensual fiduciary relationship whereby the principal has the right to control the conduct of the agent, and the agent has the power to effect legal relations of the principal. (*Milwaukee Mutual Insurance Co. v. Wessels* (1983), 114 Ill. App. 3d 746.) The test of agency is the existence of the principal's right to control the method or manner of accomplishing a task by the alleged agent, as well as the agent's ability to subject the principal to liability. (*Wargel v. First National Bank* (1984), 121 Ill. App. 3d 730, 736.) The nature and extent of agency are facts to be proved, and these questions become ones of law where the evidence is not disputed. (*Wargel,* 121 Ill. App. 3d at 736.) Moreover, the apparent authority of an agent must be based on words and acts of the principal and not on anything the agent himself has said or done. 121 Ill. App. 3d 730.

We reject Stackowski's argument that there was evidence of a principal-agent relationship between Woolcott and Brooks, whose deposition testimony provides no support for this assertion. Woolcott's relevant testimony is as follows:

"Q. What time was Chris to be returned?

A. There was really no set time.

Q. Was it your understanding though that Phil [Brooks] would bring Chris back to your house as opposed to your going to pick him up?

A. Originally we were supposed to pick him up, but we had trouble with our car, and I contacted Michael [Casillas], and Phil called back later saying that he would bring him home for me.

* * *

Q. Was Phil going to make any stops at all between Frank's house and your house while bringing Chris home?

A. No, he was not.

Q. Was it your understanding that when he was taking Chris home that he would first stop to drop off his children?

A. No, it was not.

Q. Did you agree to pay Frank—excuse me—to pay Phil any of the costs he incurred in driving Chris from Frank's house back to your house?

A. No, I did not.

Q. Was Phil going to stop and do any shopping for you, anything like that, before he returned Chris?

A. No, he was not.

Q. Did you talk to Phil directly when making the arrangements for him to bring Chris home?

A. Yes, I did.

Q. Was that by telephone?

A. Yes, it was.

Q. Was there anybody else on the line, just the two of you?

A. Just the two of us.

Q. Nobody was on another extension?

A. No.

Q. What did you say to him, and what did he say to you?

A. I don't remember verbatim, but other than he was running a little late from picking them up because of the weather, he would be coming home. I told him to be careful. He said fine.

Q. Your conversation with Phil was after you talked to Michael about the car trouble?

A. Yes, it was. No, at that point when she put Phil on the phone, and I asked him to bring Chris home.

A. That's when he said he would be running late because of the weather?

A. Right. I told him to please be careful.

Q. That was the extent of your conversation?

A. That was the extent of the conversation.

Q. Did you talk to Phil again on any occasion before the accident?

A. No, I did not."

Brooks testified that he was the owner of the vehicle involved in the accident with Stackowski's automobile and that no one else had an ownership interest in said vehicle. The purpose of the trip which involved the accident was "strictly social." The record shed no more light on the nature of Brooks' endeavor in transporting Christopher.

Several Illinois cases are similar to the one at bar. In *Osborne v.*

*City of Harvey* (1973), 16 Ill. App. 3d 740, defendant alleged that the negligence of the driver was imputable to the driver's passengers and that, therefore, the passengers were contributorily negligent. The driver of the car had been asked by his sister to drive her two daughters and herself to a wedding reception. The driver received directions to the reception from his sister's husband but used an alternate highway, upon which his vehicle plunged into a ditch. The trial court determined that the driver's negligence was not imputable to the passengers, even though they had asked the driver to transport them solely for their own purpose and benefit. In affirming the trial court's decision, the *Osborne* court stated:

> "The essential test for an agency relationship is the right to control. [Citation.] Plaintiff did not control the operation of the automobile, nor was it shown that the plaintiff had the right to control its operation. Mannella owned the car and it was he who disregarded the suggested route and turned onto Page Avenue. The purpose of the trip was purely social, had no business incidents and in substance amounted to a gratuitous act on the part of Mannella. There is no evidence of agency, and the court was correct in denying defendant's motions." *Osborne*, 16 Ill. App. 3d at 743.

Further, *Fugate v. Galvin* (1980), 84 Ill. App. 3d 573, though not specifically dealing with allegations of principal-agent relationship, nevertheless is illuminating. In *Fugate*, Harry Nosal asked defendant, Brian Galvin, to drive him to and from the home of a mutual friend. Galvin drove Nosal to the friend's without incident, but on the way back to Nosal's home, Galvin's auto struck a pedestrian. Plaintiff's complaint, which named Nosal a defendant, characterized Galvin as an independent contractor who was not being paid. The *Fugate* court found the Illinois case well settled, namely, the liability for the damage caused by the negligent act of a driver does not attach against a person other than the driver, unless said person is either the subject vehicle's owner or has the right to control the car. (*Fugate*, 84 Ill. App. 3d at 575.) After finding that liability could not attach to Nosal, the *Fugate* court stated:

> "As our ideas of personal relationships change, our notions of legal duties may change as well. [Citation.] Courts which recognize new duties do so after considering factors such as the relative ease in preventing the injury, the convenience of administration, the capacities to bear loss and the moral blame attached to the misconduct. [Citation.] As noted above, where the passenger neither owns the car nor hires the driver, the

driver has the last word and is the only one who could prevent the injury by his decision whether to drive. There would be no administrative advantage in extending liability to a passenger for an injury suffered under these circumstances. The action would involve proving the same elements as a suit against the driver for negligence because of intoxication, plus the additional elements of the passenger's relationship to the driver and his knowledge of the driver's propensity to intoxication. While creating a new duty would assist injured plaintiffs by spreading the loss among a new class of defendants, up to now society has been satisfied to rely upon the liability of the driver alone to adequately compensate injured plaintiffs. The fortuitous circumstance of one driver's inability to pay for damages he has caused should not be a reason to open new arenas of liability in search of perfect compensation schemes. Finally, as discussed above, the driver in this case bore final responsibility for the consequences of his decision. *The policy of requiring individuals to take responsibility for their own acts militates against the creation of a new duty.*" (Emphasis added.) *Fugate*, 84 Ill. App. 3d at 577.

■ Based on the record before us, we find that Woolcott did not control the operation of the subject automobile; there was no evidence that she had the right to control the vehicle. Further, the purpose of the trip was strictly social, and Brooks' transportation of Christopher was a gratuitous act, without any business aspects. There was no principal-agent relationship between Woolcott and Brooks. Moreover, as in *Fugate*, to create a new duty, as plaintiff requests, would be squarely against the public policy of this State. Accordingly, the trial court correctly granted Woolcott's motion for summary judgment on count I of Stackowski's counterclaim.

The judgment of the circuit court is affirmed.

Affirmed.

INGLIS and GEIGER, JJ., concur.