(No. 46340)

JOSEPH A. PAGLINI, Appellee, v. THE POLICE BOARD OF THE CITY OF CHICAGO *et al.*, Appellants.

*Opinion filed September 26, 1975.*

KLUCZYNSKI, J., took no part.
DAVIS, J., concurring.

Richard L. Curry, Corporation Counsel, and William R. Quinlan, Acting Corporation Counsel, of Chicago (Daniel Pascale and Robert Retke, Assistant Corporation Counsel, of counsel), for appellants.

James L. Coghlan and William J. Nellis, of Coghlan and Joyce, of Chicago, for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

Joseph A. Paglini, the plaintiff, is a lieutenant of the Chicago Police Department and the defendants are the Police Board of the City of Chicago, Marlin Johnson, Morgan F. Murphy, Sr., Reverend Wilbur N. Daniel, Paul

W. Goodrich and Louis S. Peick, the members of the Police
Board; and James B. Conlisk, Jr., the then superintendent
of police. The plaintiff filed a complaint in the circuit
court of Cook County under the Administrative Review
Act (Ill. Rev. Stat. 1973, ch. 110, par. 264 *et seq.*; ch. 24,
par. 10—1—45) seeking review and reversal of a decision of
the Police Board (the Board) which discharged him for
violations of rules of the Department, and in particular for
the improper solicitation and acceptance of $50 from a
tavern owner. He argued before the circuit court that the
proceeding against him was invalid because it was con-
ducted by a hearing officer who was not a member of the
Board, and because at no time during the hearing was a
member of the Board present. This was contrary, he said,
to the provisions of the Illinois Municipal Code (Ill. Rev.
Stat. 1971, ch. 24, par. 10—1—18.1). The plaintiff argued
in the alternative that the decision of the Board was
contrary to the manifest weight of the evidence. The
circuit court held that the City of Chicago could authorize
the Board to appoint hearing officers under the home rule
powers granted the city by section 6(a) of article VII of
the Constitution of Illinois. The court, however, reversed
the decision discharging the plaintiff on the ground that it
was against the manifest weight of the evidence. The
defendants appealed to the appellate court from the
reversal of the Board's decision, and the plaintiff cross-
appealed from the court's holding that the proceeding
before the hearing officer was legal. We have taken the
appeals under our Rule 302(b). 58 Ill.2d R. 302(b).

The Illinois Municipal Code provides for hearings
"before the Police Board or any member thereof" (Ill.
Rev. Stat. 1973, ch. 24, par. 10—1—18.1). However, the
City of Chicago by action of the city council amended the
section of its code, section 11—3, pertaining to the Police
Board. The amendment, which became effective in June
1972, provided *inter alia* for the appointment of hearing
officers by the Board and authorized them to conduct

hearings, make findings and present recommendations to the Board.

The plaintiff's contention on appeal is that a hearing officer appointed by the Board under the ordinance is an officer under section 6(f) of article VII of our constitution. As a consequence, he says the appointment must be approved by referendum as section 6(f) prescribes. However, we consider that the plaintiff's contention raises only the surface issue. An underlying question is whether the members of the Board themselves are officers within the meaning of section 6(f) so that a change in their office, for example, a change, as here, giving them power to appoint hearing officers to make findings and recommendations, is subject to approval by referendum.

Section 6(a) of article VII of the Constitution of 1970 contains a broad grant of powers to home rule units:

"(a) *** Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt."

An ordinance of a home rule unit enacted under this grant of power can supersede a previously enacted conflicting statute. See *Kanellos v. County of Cook,* 53 Ill.2d 161, 166-67; *People ex rel. Hanrahan v. Beck,* 54 Ill.2d 561, 565-66.

One of the limitations referred to in section 6(a) appears in section 6(f). It states:

"A home rule unit shall have the power subject to approval by referendum to adopt, alter or repeal a form of government provided by law, except that the form of government of Cook County shall be subject to the provisions of Section 3 of this Article. A home rule municipality shall have the power to provide for its officers, their manner of selection and terms of office only as approved by referendum or as otherwise authorized by law. A home rule county shall have the power to provide for its officers, their manner of selection and

terms of office in the manner set forth in Section 4 of this Article."

The proceedings of the constitutional convention disclose that section 6(f) was drawn to provide home rule units with greater flexibility in determining the form or structure and the operation of their governments. 7 Record of Proceedings, Sixth Illinois Constitutional Convention, Committee on Local Government, Committee Report 1665-69; Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 146-52; Parkhurst, *Two Years Later: The Status of Home Rule in Illinois*, 71 U. Ill. Bull. 26.

A reading of section 6(f) shows that its subject is the form of government of a home rule unit. If the form or structure of government is to be adopted, altered or repealed there must be an approval by referendum. When the section refers to a home rule municipality having the power to provide "for its officers, their manner of selection and terms of office only as approved by referendum or as otherwise authorized by law" the reference is to officers in the home rule unit's form of government. It is this character of officer whose office, manner of selection and term of office are to be subject to a referendum. There was no intendment by the constitutional convention that every person who might be said to be an "officer" under that broad and accommodable term would be an officer within the meaning of section 6(f). "[I]t is not to be assumed that a particular servant is an officer under all laws because he has been held to be an officer within the meaning of a particular provision." 3 Antieau, Municipal Corporation Law, sec. 22.00.

The form of government of the City of Chicago is set out in article 21 of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, par. 21—1 *et seq.*) which was adopted by referendum in an election on November 4, 1947. These sections provide *inter alia* for a mayor (ch. 24, par. 21—5), a corporation counsel (par. 21—11), a city clerk and a city

treasurer (par. 21—12) and aldermen (par. 21—22), all of whom may be considered to be officers in the city's form or structure of government.

Members of the Board here are not officers in the form or structure of government of the City of Chicago and are not officers within the meaning of section 6(f). The city under its home rule powers could authorize the Board to appoint hearing officers without the necessity of a referendum.

We turn now to the city's contention that the circuit court erred in holding that the decision of the Board was contrary to the manifest weight of the evidence.

Marian Swider is the tavern owner from whom the plaintiff was found to have wrongfully solicited money. She testified that she had met him about three times shortly after she had purchased her tavern, and that he had offered her protection in exchange for money. Thurman Chennault, a police cadet, testified that Mrs. Swider told him of this and that he called the Internal Affairs Division of the Police Department on November 27, 1971, at her request to advise that the plaintiff was coming to the tavern that evening to pick up $50. Officers Elmer Suerth and Dominic Rizzi of the Internal Affairs Division testified to arriving in plain clothes at the tavern on November 27 at about 11:30 p.m. Officer Suerth testified that he and Mrs. Swider entered the back room in the tavern where he recorded the serial number of a marked $50 note. Rizzi was sitting at one end of the bar and Suerth at the other when the plaintiff entered the tavern at about 2 a.m. He went back into the back room with Mrs. Swider after she said "I want to show you something." After a couple of minutes, the officers testified, the plaintiff, followed by Mrs. Swider, came out of the back room. Mrs. Swider gave a prearranged signal of touching her hair, indicating that the plaintiff had taken the marked money. She testified that her son, who was in the tavern, then flashed the outside lights as a signal for two police officers who were

parked outside to enter the tavern.

Officers Suerth and Rizzi testified that they confronted the plaintiff as he left the back room at the northern end of the tavern, about 10 or 12 feet from booths for customers. They said that when they identified themselves as police officers three customers who had been sitting at the bar came toward them in a menacing manner. At that point Officers Everett Major and Robert Gray, who had been parked outside, entered the tavern. Officer Major testified that Paglini was 2 or 3 feet from the booths when he entered. The attention of Suerth and Rizzi was directed at the hostile customers, and they were not watching Paglini. The three customers were escorted out of the tavern, and Major brought the plaintiff to Officers Suerth and Rizzi. They had the plaintiff empty his pockets on the table and his hat and jacket were searched. Officer Major testified that he found the marked $50 note crumpled on the seat of one of the booths.

The bartender, Arthur St. John, testified that he was outside putting up the protective gates on the tavern windows preparatory to closing when the plaintiff arrived. He said he followed Paglini inside and was behind the bar while Paglini and Mrs. Swider were in the back room. St. John said that later he saw Paglini drop something "very fast" near the booths. St. John testified at the hearing that the plaintiff had the object in his left hand; on an earlier occasion he had said it was in his right hand. Neither Officer Rizzi nor Officer Suerth observed anything dropped or thrown by the plaintiff. Officer Rizzi said that he was unable to see Paglini during the incident involving the customers.

Officer Cesar Pinzon testified that he had met Paglini on the evening of November 27 at a tavern and had asked the plaintiff for a ride to the police station. On the way to the station, he said, the plaintiff stopped at Mrs. Swider's tavern, saying he had to see a friend. Pinzon remained outside in the car. He said he was later ordered to enter the

tavern by Officers Major and Gray and directed to sit in a booth.

The plaintiff testified that he had stopped at the tavern that morning as a courtesy and as part of his duty to check taverns. Mrs. Swider had expressed concern about being alone on Saturday nights when he had conducted a "premises check" the previous Sunday. He testified that Mrs. Swider had said that she wanted to "show him something" when he entered the tavern and that she spoke of some of her personal problems to him in a nervous and incoherent fashion in the back room. He said he was standing next to Officers Rizzi and Suerth during the incident with the customers and that he was standing about 15 feet away from the booths where the money was found.

A lieutenant commander of the Chicago Police Department testified that the plaintiff had a fine reputation for integrity.

This court in *Davern v. Civil Service Com.*, 47 Ill.2d 469, described the function of judicial review on appeals from administrative decisions. It was said in *Davern*:

"The Administrative Review Act provides that agency findings on questions of fact are *'prima facie* true and correct.' (Ill. Rev. Stat. 1967, ch. 110, par. 274.) We have construed this provision to limit the function of the reviewing court to ascertaining whether the findings and decisions of the administrative agency are against the manifest weight of the evidence. [Citations.] The courts will not reweigh the evidence, but are limited to a determination whether the final decision of the administrative agency is just and reasonable in light of the evidence presented. [Citation.] Neither the appellate court nor the trial court may substitute its judgment for that of the administrative agency. [Citations.] The sole question before us, therefore, is whether the ***

finding *** was sufficiently supported so that it cannot be said to be contrary to the manifest weight of the evidence." (47 Ill.2d 469, 471-72.) See also *Basketfield v. Police Board,* 56 Ill.2d 351, 358; *Kerr v. Police Board,* 59 Ill.2d 140, 141.

Considering all of the evidence we cannot say that the finding of the Board was contrary to the manifest weight of the evidence.

For the reasons stated, that portion of the judgment of the circuit court holding the ordinance of the City of Chicago to be valid is affirmed, and that portion of the judgment reversing the Board's decision is reversed. We remand to the circuit court with directions to reinstate and affirm the Board's order discharging the plaintiff.

*Affirmed in part and reversed in part and remanded, with directions.*

MR. JUSTICE KLUCZYNSKI took no part in the consideration or decision of this case.

MR. JUSTICE DAVIS, concurring:

I concur with the decision of the court herein, and offer our decision in *Kropel v. Conlisk,* 60 Ill.2d 17, as additional reason for so doing.