THOMAS A. VILLARDITO, d/b/a Our Home Racing Stable, Plaintiff-Appellee, v. HERIBERTO ARROYO *et al.*, Defendants-Appellants.

First District (2nd Division)    No. 84—2267

Opinion filed January 7, 1986.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Candida Miranda, Assistant Attorney General, of Chicago, of counsel), for appellant Illinois Racing Board.

Barry L. Gordon, of Chicago, for appellant Carl Brandau.

Victor D. Quilici, of Bensenville, for appellee.

JUSTICE BILANDIC delivered the opinion of the court:

Prince Brazen was entered in the ninth race at Sportsman's Park Race Track in Cicero on April 27, 1983. The question was who owned this equine when the race occurred. The Illinois Racing Board (Board) found that plaintiff, Thomas Villardito, was the owner. On administrative review the circuit court disagreed and reversed the administrative decision. The issue on appeal is whether the Board's decision was against the manifest weight of the evidence.

BACKGROUND EVIDENCE

Certain undisputed general information is required for consideration of this appeal. Plaintiff, who holds the registered stable name of Our Home Racing Stable, was licensed by the Board as an owner of thoroughbred race horses. He has two brothers, Samuel and Nicky, a former jockey, who at the time in question were not licensed by the Board. Michael Reavis, however, was associated with plaintiff as a duly licensed trainer. Prior to the April 27 race, Prince Brazen was owned by one of the defendants, Carl Brandau.

The ninth race was a claiming race. As the Board explained in its extensive written order, these races are commonplace, and by entering a horse in such a race the owner offers to sell the horse for its advertised price, which in this case was $10,000. In Illinois, any licensed owner or any holder of a claiming authorization may accept the offer. The functions of claiming races are to transfer the ownership of horses and also establish a system for classifying horses to ensure a competitive racing system. As the Board noted, the owner of a horse which has a value substantially in excess of the amount set for the claiming race will not enter the horse because someone will buy it. Conversely, a horse with a value that may be significantly lower than the claiming price will not be entered because its owner might conclude that horse could not win against more valuable horses. This sys-

tem therefore creates competitive races between horses of seemingly equal value. Board rules provide that title to the horse vests in the claimant at the beginning of the race and is not subject to question even if the horse is injured in the claiming race. There is also no dispute that prior to the ninth race Michael Reavis placed a written claim in the racetrack claim box bearing the signature "T. Villardito." As the record shows, plaintiff had not signed the claim form nor given authority to anyone to do so on his behalf; rather, plaintiff's brother, Samuel, had signed plaintiff's name. After the April 27 race, custody of Prince Brazen was given to Reavis, and $10,000 was transferred from plaintiff's racing business account to Brandau. Some of the funds were provided by Reavis but later repaid by plaintiff. Shortly after the race, Reavis examined the horse and concluded that it had a sore ankle. Several days after the claim race plaintiff asked the racing stewards to nullify the claim, and, when his request was denied, the matter was brought to the Board for decision.

In its written findings the Board rejected plaintiff's assertion and concluded that the evidence showed that Reavis and Samuel Villardito had both actual and apparent authority to claim the horse for plaintiff, and plaintiff could not deny the agency relationship to defeat the interests of Carl Brandau. Further, the Board interpreted the evidence to show plaintiff's ratification of the claim when he reimbursed Reavis for the latter's use of his funds to meet the claim price. It is this finding of agency which forms the core determination of the administrative decision and issue on appeal.

Agency Evidence

In this regard Samuel Villardito testified he read a racing form concerning a horse named Joanne's Broker, and he was impressed with the horse. He therefore told plaintiff of it. Eventually, he told the owner that plaintiff was interested in a purchase, and on April 2, 1983, he was present at the racetrack when plaintiff bought that horse. Michael Reavis then became that horse's trainer. But this witness denied recollection that he made any suggestions to Reavis on the care of that animal, although plaintiff did tell Samuel to look after the horse's interest. The horse was entered in two races and was claimed on April 21, 1983. Samuel also admitted receiving a check for $410 in mid-April drawn on plaintiff's horse stable account, but he would not say for what the money was paid.

Samuel further testified that he suggested to Reavis that Prince Brazen be claimed. Reavis then filled out the claim form, Samuel signed plaintiff's name on it, and he told Reavis to claim the horse.

After the race Samuel went to the paddock area to view Prince Brazen. Later, this witness, who thought he had permission to place the claim for plaintiff on Prince Brazen because of his dealings with Joanne's Broker, learned from plaintiff that he did not have such authority.

Michael Reavis testified that he knew plaintiff, and he substantiated a conversation with plaintiff's brother, Samuel, concerning Joanne's Broker. After purchasing that horse, plaintiff came to the barn to see that horse on six occasions, and Samuel came more often. Several times plaintiff and his brother came together. Reavis also recalled that plaintiff's other brother, Nicky, also visited the barn on April 8, 1983, and directed him to ice the horse's injured tendon shortly before it first raced for plaintiff. The latter was there at the time and did not countermand Nicky's instruction. In fact when Reavis encountered plaintiff and his two brothers together, Reavis recalled that Samuel was the spokesman the majority of the time.

After Joanne's Broker won the race on April 8, Reavis suggested to plaintiff that the horse then be run in a claim race to get rid of it because the animal was not in good physical condition. When he also asked plaintiff to keep Samuel away because Samuel was too "high" on the horse and might enter it in the wrong race, plaintiff just laughed. Joanne's Broker was entered in a subsequent claim race in mid-April and claimed; following this race plaintiff told Reavis that "we" would get a better horse in a more expensive claim race. Reavis also recounted that before the ninth race on April 27, Samuel and he spoke about claiming Prince Brazen. Samuel said that he would speak to his brother who was in the track's grandstand area. When Reavis later went to that location, he found Samuel but did not see plaintiff. Samuel said that he had seen his brother and they agreed to claim Prince Brazen. However, there were insufficient funds in plaintiff's racing account, so Reavis deposited $2,000 of his own funds to plaintiff's account. Reavis then gave Samuel a claim slip, and when Samuel returned with the slip, it bore plaintiff's name. Reavis then filed the claim.

Before the claim race Reavis saw Prince Brazen for the first time as it went to the starting gate and noted that it had a bony enlargement of one ankle. When he pointed this out to Samuel, the latter said that this was "okay," and indicated that Nicky also thought the same. After the claim race, Reavis examined the horse and detected that the ankle bothered the horse but did not say anything. At the time Samuel indicated that the horse could race in a shorter distance claiming event. The day after the race Reavis told Samuel that the

horse was not sound, and two days after claiming Prince Brazen, Reavis told Samuel that the horse was still sore. Samuel then indicated that his brother would be angry.

Plaintiff recounted the purchase of Joanne's Broker and said that he did all the negotiations for that horse. However, he had previously told Samuel that the latter could look for a horse to purchase, although he never had given Samuel permission to claim a horse for him and had at some earlier unspecified point told him not to do so. He also recalled that the evening after the claiming race for Prince Brazen he was reading the newspaper when he saw that Reavis had claimed the horse for plaintiff's stable. The next day plaintiff immediately contacted a racing steward and denied claiming the animal. In accordance with the steward's direction plaintiff submitted a written denial on April 30, 1983. After a meeting with the race stewards, he repaid Reavis $2,000 advanced by Reavis to claim the horse. Plaintiff also explained that the $410 he paid Samuel was at the latter's request, and plaintiff had given his brother money on many occasions.

Plaintiff denied giving Samuel either expressly or implicitly the authority to sign plaintiff's name. While Samuel could go to the stable area and speak to Reavis, plaintiff did not give Samuel permission to consult with Reavis about a horse's physical condition or to look after his interest in any horse plaintiff had. He also said that, after Joanne's Broker was claimed, he did not recall telling Reavis anything about another horse.

The circuit court's comments show that the court premised its ruling on its belief that none of the evidence should have been construed by Reavis to show that Samuel had authority to submit a claim. On appeal, both Brandau and the Board contend that the circuit court's decision was erroneous. Principally, they argue that the facts showed that Samuel Villardito had either actual or apparent authority to file the claim, and the Board also urges that plaintiff's repayment of the $2,000 which Reavis had used toward the claiming price was a ratification of Samuel's actions.

■ We start with the basic premise that the Board has the obligation to weigh the evidence and resolve the factual questions presented; that evaluation should not be set aside on administrative review unless it is against the manifest weight of the evidence. *Paglini v. Police Board* (1975), 61 Ill. 2d 233, 239-40, 335 N.E.2d 480.

■ As we have recited, the Board found that Samuel had apparent authority from plaintiff to submit a claim for Prince Brazen. In *Wargel v. First National Bank* (1984), 121 Ill. App. 3d 730, 737, 460 N.E.2d 331, the court said:

" 'Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds his agent out as possessing—it is such authority as a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.' [Citation.] The apparent authority of an agent must be based on words and acts of the principal, and not on anything the agent himself has said or done."

We believe that the Board in evaluating the evidence could have reasonably concluded that Reavis thought Samuel was acting as an agent for plaintiff when the claim was made. The evidence shows that Samuel was substantially involved in the purchase of Joanne's Broker several weeks before the claim was lodged for Prince Brazen. Reavis' testimony also showed that Samuel was involved with day-to-day handling of the horse, and, when Reavis complained to plaintiff about that matter, plaintiff just laughed. Further, after Joanne's Broker was claimed, plaintiff told Reavis that "we" would get a better horse. Thereafter Samuel told Reavis about Prince Brazen. The record shows that irrespective of plaintiff's claim to the contrary, he allowed his brother Samuel to act as if he were plaintiff's agent in regard to plaintiff's racing interests. Reavis' acceptance of Samuel's implicit agency with plaintiff and apparent authority was not unreasonable, and plaintiff did nothing to dispel Reavis' belief. The Board's conclusion to this effect is supported by the evidence, and the circuit court therefore should not have substituted its evaluation.

Accordingly, the judgment of the circuit court is reversed.

Reversed.

PERLIN and HARTMAN, JJ., concur.