2024 IL App (1st) 230926

SECOND DIVISION
September 10, 2024

No. 1-23-0926

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| ANTHONY P. SCHITTINO, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | Appeal from the |
| THE VILLAGE OF NILES, ILLINOIS, a Municipal | ) | Circuit Court of |
| Corporation; MARLENE J. VICTORINE, in Her Official | ) | Cook County. |
| Capacity as Village Clerk; and KAREN A. | ) | |
| YARBROUGH, in Her Official Capacity as Cook County | ) | |
| Clerk, | ) | 23 CH 1201 |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (The Village of Niles, Illinois, and Marlene J. Victorine, | ) | Araceli De La Cruz, |
| Defendants-Appellees; | ) | Judge Presiding. |
| Joseph P. Makula and David A. Carrabotta, | ) | |
| Intervenors-Appellants). | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     At a municipal election in 2021, the citizens of the Village of Niles, Illinois (Village) adopted a referendum that changed the manner in which members of its village ethics board were selected (the Referendum). The Referendum called for the *election* of the ethics board members, rather than their appointment by the village board of trustees (Village Board). After a court battle, the Referendum was adopted at the April 2021 election, so the Village scheduled elections for the ethics board at the next municipal election in 2023.

¶ 2       Plaintiff Anthony Schittino, a registered voter and resident of Niles, sued, claiming that the Referendum was not authorized by the Illinois Constitution. The circuit court agreed, declaring the Referendum invalid and enjoining its enforcement. The court impounded the results of the ethics board elections. Two intervening parties, in support of the referendum, appeal.

¶ 3       We agree with the circuit court that the Illinois Constitution does not authorize the change made by the Referendum. We thus affirm the circuit court's judgment in all respects.

¶ 4                                              BACKGROUND

¶ 5       To understand the issues in this appeal, we begin with the initial passage of the Referendum and the legal battle that preceded it. We include in this background the results of various elections, which we may judicially notice. *Jackson v. Board of Election Commissioners of Chicago*, 2012 IL 111928, ¶ 22 n.1.

¶ 6       For years, the Village of Niles, a home-rule unit, has provided by ordinance for a board of ethics whose members are appointed by the Village Board. See Niles Municipal Code of Ordinances § 2-425(a) (adopted Apr. 29, 2009). In 2019, the voter-initiated Referendum sought to replace the appointed board with an elected one. The Niles Village Clerk, Marlene Victorine (Village Clerk), refused to certify the Referendum for the ballot because she believed that it was not authorized by law or the constitution. Typically, challenges to referendum petitions are prompted by an objection from a registered voter, and the objection is then heard by a municipal electoral board subject to court review. See 10 ILCS 5/10-8 (2018). In this case, however, the Clerk took it upon herself to deem the Referendum question unconstitutional and refused to certify it.

¶ 7    Joseph Makula, who is also an intervenor in the present case, sued the Village and Victorine in *mandamus*, asking the court to order Victorine to place the Referendum on the ballot. Principal among his arguments was that the Clerk lacked authority, on her own, to decide questions of constitutionality and ballot eligibility. At most, Makula argued, the Clerk could reject referenda questions or nomination petitions for obvious, facial deficiencies in the petitions themselves.

¶ 8    The circuit court agreed, and so did this court in *Makula v. Victorine*, 2021 IL App (1st) 201298-U, ¶¶ 26-27. A different panel of this court held in *Makula* that the Clerk exceeded her limited statutory authority by acting, on her own and without a citizen objection, to deny ballot certification based on matters of constitutionality. *Id.* This court thus affirmed the judgment of the circuit court that permitted the Referendum to be placed on the ballot at the April 2021 consolidated municipal election.

¶ 9    At the April 6, 2021, municipal election, voters in Niles adopted the Referendum by a vote of 1,661 to 252, an approval of over 85%.[1]

¶ 10    A year after the Referendum passed, there was an attempt to repeal it before an election of the ethics board could be held. The Village Board adopted a resolution—Resolution 2022-27R—to place a new referendum on the June 2022 ballot to repeal the Referendum that had passed in April 2021 and restore the ethics board to appointed positions. At the June 28, 2022,

---

[1]See report on Village of Niles, Ethics Board referendum, Cook County Clerk's Office, Elections, *Tabulated Statement of the Returns and Proclamation of the Results* (Apr. 27, 2021), https://www.cookcountyclerkil.gov/sites/default/files/2021-11/SummaryReport_040621_v2.pdf [https://perma.cc/57WS-JY4F].

statewide primary election, the citizens of Niles voted down that second referendum by a vote of 1,721 to 1,689, a difference of less than one percent.[2]

¶ 11     So the Referendum remained in effect. The Village scheduled elections for April 2023 for the ethics board positions, and several candidates filed nomination papers for those positions.

¶ 12     In February 2023, plaintiff Schittino filed the present action, seeking a declaration that the Referendum was not authorized by article VII, section 6(f) of the Illinois Constitution (Ill. Const. 1970, art. VII, § 6(f)). He sought a permanent injunction against the Village, prohibiting the certification of any election pursuant to the Referendum.

¶ 13     Almost immediately, Makula (the "principal proponent" of the Referendum) and David Carrabotta (a candidate for the ethics board) moved to intervene. They argued that intervention was appropriate because the nominal defendants—the Village and Village Clerk Victorine— were opposed to the Referendum and would not fairly defend its validity. The circuit court permitted intervention. We will refer to Makula and Carrabotta collectively as "Intervenors."

¶ 14     Intervenors also moved to dismiss this suit on the grounds of *res judicata*, claiming that our earlier decision in *Makula*, 2021 IL App (1st) 201298-U, had already established the validity of the Referendum. In an order dated March 15, 2023, the circuit court denied the motion to dismiss.

¶ 15     Plaintiff then moved for summary judgment, arguing that the Referendum's changes to the ethics board were not authorized by the home-rule provisions of the Illinois Constitution. Intervenors responded, much as they did in their motion to dismiss, that the *Makula* decision

---

[2]See report on Village of Niles, Form of Government, Cook County Clerk's Office, Elections, Summary Report—Official Results, (June 28, 2022), https://www.cookcountyclerkil.gov/sites/default/files/2022-11/SummaryReport2Column_20221031103744307.pdf [https://perma.cc/4NFL-J9XR].

controlled and already established the validity of the Referendum. They also argued that the lawsuit was barred by the doctrine of *laches*, as plaintiff waited too long, and to the detriment of Intervenor Carrabotta (the ethics board candidate), before filing this lawsuit.

¶ 16 On April 26, 2023, the circuit court granted plaintiff's motion for summary judgment. Intervenors timely filed their notice of appeal.

¶ 17 This appeal was initially assigned to a different division of this court. Intervenors filed a motion for "change in venue," which was taken by the court as a motion for recusal, based on the fact that one of the justices in that division had a conflict. The motion, however styled, was granted, and the matter was reassigned to this division and this panel.

¶ 18 We should also explain at the outset that the nominal defendants, the Village and the Village Clerk Victorine, are clearly aligned with plaintiff Schittino here and have even filed a joint brief with Schittino in support of affirming the trial court's judgment. So for ease, at times we will refer to the appellate arguments of the Village, the Village Clerk, and Schittino, collectively as those of "plaintiffs."

¶ 19                                              ANALYSIS

¶ 20                                                    I

¶ 21 We begin, as we must, by addressing questions of our jurisdiction. The appellate court is one of limited review. We may not review simply anything we wish that transpired in the circuit court, searching for mistakes to fix, for wrongs to right. Rather, in our adversarial system, we may review only those judgments and orders that appellants identify in their notice of appeal. See Ill. S. Ct. R. 303(b)(2) (eff. July 1, 2017). This is not a matter of our discretion; this is a mandatory rule. *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 176 (2011). Indeed, questions of appellate jurisdiction are so integral that we must consider them on our own, even if the

parties do not raise them. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 251-52 (2010).

¶ 22    Illinois Supreme Court Rule 303(b)(2) (eff. July 1, 2017) requires that notices of appeal specify the judgments or orders being appealed. Ill. S. Ct. R. 303(b)(2) (eff. July 1, 2017) (notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court"). Generally speaking, we lack jurisdiction over any judgment or order that is not included in the notice of appeal. *Corah v. The Bruss Co.*, 2017 IL App (1st) 161030, ¶ 20.

¶ 23    As noted, this appeal comes by way of the grant of summary judgment in favor of plaintiff Schittino, a judgment order dated April 26, 2023. The notice of appeal properly identifies that judgment order as the one under challenge here, asking us "to reverse the judgment of the [circuit court] entered on April 26, 2023, in favor of [plaintiff]." There is no question, then, that we have jurisdiction to consider the propriety of that April 26 judgment order.

¶ 24    But one of the arguments raised in the Intervenors' brief is that "[t]he trial court erred by denying the *motion to dismiss the complaint* for declaratory judgment as *res judicata*." (Emphasis added.) That order was not entered on April 26; the circuit court denied the motion to dismiss in an order dated March 15, 2023. The March 15 order is not identified in the Intervenors' notice of appeal in any way, shape, or form, nor is there any mention of the doctrine of *res judicata* in the notice of appeal.

¶ 25    As the notice of appeal identified only the April 26, 2023, summary judgment order, we lack jurisdiction to review the March 15, 2023, order denying the motion to dismiss. See *Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.*, 78 Ill. 2d 56, 61 (1979) (supreme court had no jurisdiction to review order dismissing counterclaim when notice of appeal only sought review of

order granting summary judgment); *Corah*, 2017 IL App (1st) 161030, ¶¶ 20-21 (notice of appeal identifying order granting summary judgment did not give appellate jurisdiction over earlier order dismissing parts of complaint); *Village of Lisle v. Village of Woodridge*, 192 Ill. App. 3d 568, 572 (1989) (same); *Long v. Soderquist*, 126 Ill. App. 3d 1059, 1062 (1984) (same).

¶ 26    Plaintiffs raised this jurisdictional defect in their response brief before this court, and Intervenors did not even attempt to justify appellate jurisdiction over this March 15 order in their reply brief. As we lack jurisdiction to do so, we have no choice but to decline to consider whether the dismissal of the complaint was proper on the grounds of *res judicata*.

¶ 27                                             II

¶ 28    We turn to the court's entry of summary judgment. Summary judgment is appropriate when the record as a whole, viewed in the light most favorable to the non-movant, shows that there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 127-28 (2005). Our review is *de novo*, meaning we owe no deference to the circuit court's ruling. *Fox v. Seiden*, 2016 IL App (1st) 141984, ¶ 12.

¶ 29    Intervenors raise two issues regarding the entry of summary judgment. First, plaintiff's suit is barred by the *laches* doctrine. And next, on the merits, the court erred in ruling that the constitution does not authorize the Referendum.

¶ 30                                             A

¶ 31    We start with *laches*. The doctrine of *laches* is an affirmative defense asserted against a party that has knowingly slept on its rights for an unreasonable length of time, resulting in prejudice to the party asserting the defense. *Noland v. Mendoza*, 2022 IL 127239, ¶ 32; *Tillman v. Pritzker*, 2021 IL 126387, ¶ 25. For obvious reasons, a *laches* inquiry is highly fact-intensive

and dependent on the unique circumstances of each case. *PNC Bank, National Ass'n v. Kusmierz*, 2022 IL 126606, ¶ 26.

¶ 32    Intervenors' argument, in a nutshell, is that plaintiff Schittino, who filed suit to challenge the constitutionality of the Referendum in February 2023, waited too long, given that the Referendum was first adopted in April 2021. That delay, they argue, resulted in prejudice to one of the Intervenors, Carrabotta, who was one of 11 people who filed nomination papers for a position on the ethics board in the April 2023 election.

¶ 33    We note at the outset, as plaintiffs do in their brief, that Intervenors have taken a very curious path to asserting this defense. They initially moved for dismissal of the complaint but not based on *laches*, limiting the basis of their motion to *res judicata*, even though it would have been permissible to raise *laches* in a motion to dismiss. See *id.* When their motion to dismiss was denied, they answered the complaint but did not raise *laches* as an affirmative defense, either, though they should have. See 735 ILCS 5/2-613(d) (West 2022) ("The facts constituting any affirmative defense, such as *** laches *** must be plainly set forth in the answer or reply."). Nor did they move (or cross-move) for summary judgment on the ground of *laches*. Instead, they simply responded to *plaintiff's* motion for summary judgment by mentioning *laches* for the first time.

¶ 34    Indeed, plaintiffs say that Intervenors forfeited the *laches* argument by failing to raise it as an affirmative defense. There is support in the law for that general rule. See *Stevens v. McGuireWoods LLP*, 2015 IL 118652, ¶ 22; *Fox*, 2016 IL App (1st) 141984, ¶ 51. But it would be unfair to apply forfeiture here. This suit, for understandable reasons, moved at warp speed. The complaint was filed in February 2023; the motion to dismiss was denied on March 15; the entry of summary judgment was April 26. It is not as if Intervenors held this argument close to

their vests for years and sprung it on plaintiffs at the midnight hour. *Cf. Fox*, 2016 IL App (1st) 141984, ¶ 51 (defendant waited eight years to raise affirmative defense of unclean hands). Nor do we perceive any prejudice to plaintiffs under these circumstances.

¶ 35    Plaintiffs also argue that intervening parties have no right to raise the affirmative defense of *laches*. We acknowledge, to our surprise, that there is some support for that proposition, as well. See, *e.g.*, *Malatesta v. Mitsubishi Aircraft International, Inc.*, 275 Ill. App. 3d 370 (1995). It is not clear to us why such a hard-and-fast rule would exist; there might be individual circumstances in which an intervenor forfeits or otherwise loses its right to raise a certain affirmative defense, but never? If nothing else, that notion runs directly counter to the intervention statute, which makes clear that "[a]n intervenor shall have all the rights of an original party." 735 ILCS 5/2-408(f) (West 2022). We would think that asserting an affirmative defense is every bit as much a "right" as any other a defendant possesses.

¶ 36    To be sure, there may be specific circumstances when an intervenor may be denied the right to file certain affirmative defenses. See *id.* (court in its discretion may order that intervenor be barred from raising issues that are new or that conflict with previous court rulings in case). Whatever those situations may entail, we will not enforce a rule here that denies Intervenors the right to assert an affirmative defense. The entire reason for the intervention here is that the nominal defendants (the Village and Village Clerk) are aligned with plaintiff Schittino; they agree with him that the Referendum is not authorized by the constitution. Intervenors are literally the only party defending this Referendum. Their role here is critical. We cannot fathom how the law would countenance allowing these individuals to intervene as the only true defendant, on the one hand, but then deny them the right to assert defenses to the action, on the other.

¶ 37    It is one thing, however, to say that Intervenors should have the right to assert a *laches* defense. It is another to say that Intervenors have adequately prosecuted this claim or that it has merit. Though we respect Intervenors' right to assert *laches* as a defense, we agree with plaintiffs that they have not done so adequately, and we further agree that *laches* is not warranted here.

¶ 38    As noted, and for understandable reasons, "*laches* depends on the facts and circumstances of each case." *Kusmierz*, 2022 IL 126606, ¶ 26. And when, as here, a non-movant opposes summary judgment, "the nonmoving party must present a factual basis that would arguably entitle the party to a judgment." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). This requirement ensures " 'that trial judges are presented with valid evidentiary facts upon which to base a decision.' " *Id.* at 336 (quoting *Solon v. Godbole*, 163 Ill. App. 3d 845, 851 (1987)).

¶ 39    Intervenors, in pressing their *laches* argument, presented no evidentiary basis whatsoever to establish the elements of unreasonable delay and prejudice—no affidavits, no deposition testimony, no citations to official sources, nothing. On the question of how Intervenor Carrabatta was prejudiced by any delay in this lawsuit, Intervenors simply wrote in the circuit court that Carrabotta was "one of the eleven candidates who filed nomination papers seeking election to the Niles Ethics Board." No citation to any evidentiary source to establish even that Carrabotta was a candidate, much less how that fact alone establishes prejudice. Though we do not doubt that Carrabotta was a candidate, a party opposing summary judgment may not simply cite an allegation in a pleading and expect a court to accept it as evidence. *Id.* at 335.

¶ 40    On appeal, Intervenors go only a tiny step further and explain the prejudice to Intervenor Carrabotta this way: "Carrabotta expended significant time, energy, labor, and money to qualify for the April 4, 2023 ballot." Again, however, rather than support this statement with an affidavit or the like, Intervenors merely state this information as if we are required to accept it. Nor do

Intervenors elaborate on this statement; they do not tell us, for example, when Carrabotta filed for the ballot, how much time he spent campaigning, how much money he raised and spent, or whether he may have chosen not to seek election at all if he knew that plaintiff was challenging the Referendum's validity.

¶ 41    At least some of this information is presumably available from public sources. We could probably comb campaign-finance records from the state board of elections and discover the amount of money Carrabotta raised and spent. But at the summary judgment stage, litigants are not permitted to merely slap information down on paper and expect the courts and their opposing party to scramble to confirm or deny it independently. The requirement that opponents of a summary judgment motion supply evidentiary facts to support their position is not a mere suggestion; the failure to do so renders their argument deficient. *Id.*

¶ 42    And circling back to the original procedural objections by plaintiffs: this failure of evidentiary support in the record is particularly troubling because Intervenors never pleaded *laches* as an affirmative defense. Had Intervenors done so, alleging facts, plaintiffs could have replied to those facts, at least potentially agreeing on some facts on which Intervenors could then rely. See 735 ILCS 5/2-602 (West 2022) ("If new matter by way of defense is pleaded in the answer, a reply shall be filed by the plaintiff ***."). But by raising *laches* for the very first time in response to a motion for summary judgment, and then not supplying a single evidentiary fact to support it, Intervenors have made it all but impossible to grant them relief on this basis.

¶ 43    Even if we put all these problems aside, we would not apply the doctrine of *laches* here. True, though it is uncommon, it is not unheard of to apply *laches* in the context of a constitutional challenge to a statute or ordinance (or here, an adopted referendum). See *Noland*, 2022 IL 127239, ¶ 41. But we should not lightly deny constitutional challenges based on *laches*.

The constitution is the final source of protection for the citizens of this state; if an enacted law violates their rights, they should typically be permitted access to the courts to make their case.

¶ 44     Indeed, the situations where *laches* has been found in this context are typically rather extreme examples of unreasonable delay, substantial prejudice, or both. In *Noland*, for example, a legislator who voted for (and even sponsored) legislative pay freezes every year from 2009 to 2014, but who then sued to challenge the constitutionality of those pay freezes after leaving office in 2017 and asking for a recoupment of lost salary, was barred by *laches*. *Id.* ¶¶ 6-10, 42. In *Tillman*, 2021 IL 126387, ¶ 26, a taxpayer who was aware of a general obligation bond authorization when the bonds were issued in 2003, but who waited 16 years to challenge its constitutionality in court, was charged with *laches*.

¶ 45     Here, considering that Intervenors have provided us with no additional facts via affidavit or otherwise, we can glean this much from undisputed facts and judicial notice:

     (1) at the April 2021 municipal election, voters in Niles adopted the Referendum by a wide margin;

     (2) after the Village Board passed a resolution in March 2022 that placed another referendum on the June 28, 2022 ballot that would repeal the Referendum at issue, that second referendum failed by less than one percent; and

     (3) plaintiff Schittino filed suit on February 7, 2023, two months before the April 2023 election that would elect the first ethics board members.

¶ 46     Not a great deal to go on. Intervenors say that Schittino acted unreasonably in waiting the sum of "twenty-one months" before filing suit. But it is not clear to us why Schittino was required to sue before learning the outcome of the June 28, 2022 election, where the Referendum survived repeal by the narrowest of margins. Indeed, had he sued before the outcome of that

election, he might well have run straight into an argument that the suit was premature, or at least should be stayed until the outcome of the June 2022 election, given that a repeal of the Referendum was possible.

¶ 47    The time from the end of June 2022 to the beginning of February 2023 is slightly more than seven months. Seven months does not strike us as an unreasonable amount of time to challenge the constitutionality of an adopted referendum, without more. And we have been provided nothing more by way of evidentiary fact.

¶ 48    This case is quite unlike the election cases cited by Intervenors, which involved delays of a year or less. For example, in *Tully v. State*, 143 Ill. 2d 425, 428-29 (1991), a sitting appellate judge over the age of 75, Justice White, refused to retire pursuant to the state's mandatory retirement law; he filed for retention for an additional term while, at the same time, the board of elections scheduled primary elections for that vacancy for March 1990. Justice White was aware of the contested primary races and knew that Tully had won the Democratic primary, while another individual won the Republican primary. *Id.* at 429. In September 1990, Tully became aware that Justice White was filing for retention for that same seat and, after attempting to resolve the matter, filed suit in October 1990—just a month before the general election. *Id.* at 429-30.

¶ 49    Justice White, a named defendant, filed an affirmative defense that the mandatory-retirement law was unconstitutional, and thus he had the right to seek retention, rendering the vacancy for which Tully was running void. *Id.* The supreme court found that Justice White was barred by *laches* from challenging the constitutionality of the mandatory-retirement law, because White knew that he would be forced into retirement for nearly a year before his term expired, and he sat idly as he observed candidates file nominating petitions for his seat, campaign, and

win their primary contests. *Id.* at 434. Even after the primaries, White did nothing to challenge their candidacies, only raising his constitutional challenge after Tully filed suit. *Id.* Simply put, "White did not assert his constitutional challenge to the automatic retirement provision *** for almost a year. During that period, Tully and others were prejudiced by White's delay." *Id.*

¶ 50    *Tully* is an example where a specific candidate had a specific objection to a specific nomination petition (or petitions) but failed to assert it before the election, when such objections are typically mounted. Here, in contrast, it is not that Schittino had some objection to Carrabotta's petitions, sat on it, and sprung it after the election. Schittino is challenging the constitutionality of the Referendum itself, separate and apart from any particular election spawned by that Referendum. Unlike objections to nominating petitions, which are governed in detail by the Election Code, there is no specified deadline or time frame for challenging the constitutionality of a law, ordinance, or referendum.

¶ 51    And it would be bizarre if there were. If we carried Intervenors' reasoning to its logical extension, if someone did not challenge this Referendum immediately, a lawsuit would be forever barred by *laches*. At any point in time, either someone would be campaigning for the elected office of ethics board or would be holding that office. The application of *laches*, under Intervenors' logic, would forever immunize the Referendum from constitutional challenge unless a litigant immediately challenged it. That is an unduly harsh application of the doctrine and not one that we recognize.

¶ 52    Under the extremely limited facts that Intervenors have presented us, there is no basis whatsoever for a finding of *laches*.

¶ 53                                            III

¶ 54    We move to the substantive question in this appeal: whether the Referendum was

properly adopted under the home-rule provisions of the Illinois Constitution. See Ill. Const. 1970, art. VII, § 6(f). In article VII, section 6, a municipality that adopts (or is automatically granted) home-rule status has far greater power over its affairs than the typical municipality, whose power is circumscribed entirely by state law. Compare Ill. Const. 1970, art. VII,§ 6, with Ill. Const. 1970, art. VII, § 7 (non-home-rule units).

¶ 55     A home-rule municipality has the general authority to "exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a). And that broad home-rule authority is most typically exercised by the adoption of ordinances by the local legislative body—the city council or, in this case, the Village Board. See *Sullivan v. Village of Glenview*, 2020 IL App (1st) 200142, ¶ 52 (local legislative bodies act through adoption of ordinances).

¶ 56     But that authority is not unlimited. That very language we quoted above in subsection (a) is preceded by the language, "Except as limited by this Section, ***." Ill. Const. 1970, art. VII, § 6(a). And section 6 does, indeed, contain a few exceptions to the general rule of broad home-rule authority in subsection (a). Some actions are deemed to be so critical and fundamental to the nature of local government that they may be taken only by referendum—that is, not in the typical way of adopting an ordinance but, instead, by enlisting the citizens of the municipality to vote on the question via referendum. See Ill. Const. 1970, art. VII, § 6(f); *Leck v. Michaelson*, 111 Ill. 2d 523, 527 (1986). Section 6(f) provides two of those exceptions that require action by referenda, reading in relevant part as follows:

> "A home rule unit shall have the power subject to approval by referendum to adopt, alter
>
> or repeal a form of government provided by law ***. A home rule municipality shall

have the power to provide for its officers, their manner of selection and terms of office only as approved by referendum or as otherwise authorized by law." Ill. Const. 1970, art. VII, § 6(f).

This provision obviously denotes two of the actions that a home-rule village may take only by referendum: (1) to change the form of government and (2) to provide for its officers, their manner of selection, and their terms of office.

¶ 57     So if a home-rule municipality wishes to undertake an action that falls within one of these exceptions, the exclusive manner of accomplishing that action is via referendum; it cannot be undertaken in the typical way a home-rule municipality would act—by adopting an ordinance. See *Dunne v. County of Cook*, 108 Ill. 2d 161, 162-63, 167 (1985) (invalidating ordinance that lowered vote requirement for override of board president's veto, as it amounted to change in statutory form of government under section 6(f) and thus could only be accomplished via referendum). On the flip side of that coin, if an action does *not* fall within these exceptions (or others specified in Section 6, not relevant here), a binding referendum is not permitted. *Harned v. Evanston Municipal Officers Electoral Board*, 2020 IL App (1st) 200314, ¶ 39.

¶ 58     In the circuit court, plaintiffs argued that neither clause of section 6(f) authorized the Referendum here; the Referendum thus had no legal effect; and they were entitled to summary judgment. In response, Intervenors identified only the second clause of section 6(f)—the "officers" clause—as authority for the Referendum. On appeal, as well, Intervenors rely solely on the "officers" clause and raise no argument concerning the form-of-government clause. So we limit our consideration to whether the "officers" clause authorizes the Referendum.

¶ 59                                              A

¶ 60     But first, we address Intervenors' claim that this court's earlier decision in *Makula*, 2021

IL App (1st) 201298-U, controls the disposition of this case. It does not. First, we are not bound by a previous appellate decision; we will obviously give it due respect but are free to disagree with it. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 392 n.2 (2005).

¶ 61     More to the point, *Makula* did not address the substantive issue before us. As discussed briefly above, *Makula* arose after the Village Clerk declined to certify the Referendum question for the April 2021 ballot *not* because of a meritorious objection filed by a registered voter, and *not* because of some facial infirmity in the petition papers, but because she believed that the Referendum was not authorized by the Illinois Constitution. See *Makula*, 2021 IL App (1st) 201298-U, ¶ 26-27.

¶ 62     A different panel of this court held that the clerk's ministerial role by law was limited to determining whether the Referendum petition was in "apparent conformity" with filing requirements—*e.g.*, having the minimum number of signatures or containing a statement of candidacy—and not matters of substantive constitutionality. *Id.* ¶¶ 27-28; see 10 ILCS 5/10-8 (West 2018). Because there was no claim of facial nonconformity with the Referendum petition, the Clerk was required to certify it for the ballot. *Makula*, 2021 IL App (1st) 201298-U, ¶ 27.

¶ 63     True, Village Clerk Victorine did attempt to argue to the court that the Referendum was not authorized by the "officers" clause of section 6(f). *Id.* ¶ 24. But this court ruled that she had failed to develop the argument, thus forfeiting it under Illinois Supreme Court Rule 341(h) (eff. Nov. 1, 2017). *Makula*, 2021 IL App (1st) 201298-U, ¶ 24. And if any more need be said, the sole case Village Clerk Victorine cited for the proposition that ethics board members in Niles do not qualify as "officers," *Midwest Television, Inc. v. Champaign-Urbana Communications, Inc.*, 37 Ill. App. 3d 926, 931-32 (1976), had nothing whatsoever to do with home rule, much less section 6(f); that decision concerned the interpretation of a conflict-of-interest statute. So under

no circumstances could we glean the slightest bit of guidance from *Makula* with regard to the substantive questions before us.

¶ 64                                             B

¶ 65     To restate, Intervenors claim that article VII, section 6(f) authorizes the Referendum because that provision provides, in relevant part, that "[a] home rule municipality shall have the power to provide for its officers, their manner of selection and terms of office only as approved by referendum or as otherwise authorized by law." Ill. Const. 1970, art. VII, § 6(f). Intervenors argue that members of the Niles Ethics Board qualify as "officers" under this provision, and the Referendum changed "their manner of selection" from appointed to elected. Thus, they say, this change was appropriately accomplished via referendum as opposed to village ordinance.

¶ 66     The case law, however, holds otherwise. Our supreme court long ago explained that the word "officers" in section 6(f) should not be interpreted as broadly as one might colloquially use that word. See *Paglini v. Police Board of Chicago*, 61 Ill. 2d 233, 236 (1975). Rather:

> "A reading of section 6(f) shows that its subject is the form of government of a home rule
> unit. *** When the section refers to a home rule municipality having the power to
> provide 'for its officers, their manner of selection and terms of office only as approved by
> referendum or as otherwise authorized by law' *the reference is to officers in the home
> rule unit's form of government*. It is this character of officer whose office, manner of
> selection and term of office are to be subject to a referendum. *There was no intendment
> by the constitutional convention that every person who might be said to be an 'officer'
> under that broad and accommodable term would be an officer within the meaning of
> section 6(f).*" (Emphases added.) *Id.*

¶ 67     *Paglini* involved the question of whether a member of Chicago's police board was an

"officer" under section 6(f). State law had provided that matters of police misconduct be heard by the city's police board, but the city council, by ordinance, provided that the board could appoint hearing officers to hear the matters. *Id.* at 234-35. The plaintiff, the subject of discipline at one of these hearings, challenged the validity of the hearing held by the hearing officer, claiming that members of the police board were "officers" under section 6(f), and thus a referendum was required to effect the change made by ordinance. *Id.* at 235.

¶ 68    Our supreme court disagreed, first making the observation we quoted above. Because the "officers" referenced by section 6(f) are only those included in the form of government identified in state law, the supreme court turned to the relevant provisions of the Illinois Municipal Code that provided for the form of government Chicago had adopted. *Id*. at 236.

¶ 69    The court determined that officers identified in the form of government were "a mayor [citation], a corporation counsel [citation], a city clerk and a city treasurer [citation] and aldermen [citation], all of whom may be considered to be officers in the city's form or structure of government." *Id.* at 236-37. The court concluded that "[m]embers of the [Police] Board here are not officers in the form or structure of government of the City of Chicago and are not officers within the meaning of section 6(f)." *Id.* at 237. The city ordinance that altered the police board members' role was thus valid, and a referendum would have been inappropriate. *Id.*

¶ 70    This court followed *Paglini* more recently in *Jaros v. Village of Downers Grove*, 2017 IL App (2d) 170758, ¶ 1, which considered whether a member of the village's library board, Jaros, was an "officer" under section 6(f). The village council had appointed Jaros to a six-year term on the library board but, pursuant to an ordinance granting it authority to do so, removed him from the board before his term had expired. *Id.* ¶¶ 4-5. Jaros sued, claiming (among other things) that a member of the village library board was an "officer" under section 6(f), and thus an ordinance

permitting the village council to remove him mid-term was invalid, as it could only be accomplished by referendum. *Id.* ¶ 24.

¶ 71    This court firmly rejected that argument, citing our supreme court's holding in *Paglini* that section 6(f) refers only to " 'officers in the home rule unit's form of government.' " *Id.* ¶ 29 (quoting *Paglini*, 61 Ill. 2d at 236). We noted that the Village of Downers Grove's form of government was not materially different from that of Chicago: "In addition to an elected mayor and an elected council, there are appointed officers, including a manager, clerk, treasurer, and attorney." *Id.* ¶ 31. This court concluded that "the Village's library trustees are no more 'officers' under section 6(f) than were the members of Chicago's police board in *Paglini*." *Id.*

¶ 72    The same result obtains here. The relevant provision of the Illinois Municipal Code requires that each village shall have "a president, trustees, and a clerk." 65 ILCS 5/3.1-15-5 (West 2022). There is no mention of an ethics board in state law applicable to the village-trustee form of government that Niles has chosen, nor do Intervenors provide us any such citation.

¶ 73    Indeed, the outcome here is even more obvious than in *Jaros*. As plaintiffs note, the library board held many more attributes of local government than the ethics board here. Library boards have the authority to levy their own taxes; they have budgets and employees. See *Jaros*, 2017 IL App (2d) 170758, ¶ 39 (citing *City of Rockford v. Gill*, 60 Ill. App. 3d 94, 100 (1978)).

¶ 74    Here, in contrast, the ethics board was created by village ordinance as a purely advisory body. See Niles Municipal Code of Ordinances § 2-425(a) (adopted Apr. 29, 2009) (creating ethics board). The board's powers and duties include, upon request of the Village Board or an appointed official, "giv[ing] advisory opinions" to the Village Board on proposed action concerning ethics matters and "mak[ing] recommendations to [the Village Board] for changes in the village's [ethics code]." *Id.* § 2-427(a), (c). The village ordinances clarify that "findings of

the Board of Ethics are advisory only" (*id.* § 2-427(d)), and the ethics board "does not have the power to issue subpoenas." *Id.* § 2-427(e).

¶ 75    So while ethics boards such as the one in Niles perform valuable work, and by no means do we suggest otherwise, the case law leaves no room for debate—members of Niles's ethics board are not "officers" under section 6(f). To paraphrase and expand on the statement made in *Jaros*, 2017 IL App (2d) 170758, ¶ 31, the ethics board members in Niles are no more "officers" under section 6(f) than were the members of Chicago's police board in *Paglini* or Downers Grove's library board in *Jaros*.

¶ 76                                    CONCLUSION

¶ 77    The Referendum is not authorized by article VII, section 6 of the Illinois Constitution. The circuit court thus did not err in entering summary judgment in favor of plaintiff. We affirm the circuit court's judgment in all respects.

¶ 78    Affirmed.

*Schittino v. Village of Niles*, 2024 IL App (1st) 230926

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 23-CH-1201; the Hon. Araceli De La Cruz, Judge, presiding. |
| **Attorneys for Appellant:** | Daniel J. Kelley, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Steven M. Laduzinsky, of Laduzinsky & Associates, P.C., of Chicago, and Ross D. Secler, of Odelson, Murphey, Frazier, & McGrath, Ltd., of Evergreen Park, for appellees. |